**O. K. ARMSTRONG and M. M. Armstrong**
**v.**
**The UNITED STATES.**
**No. 225-60.**

United States Court of Claims.
Dec. 17, 1965.

Clarence T. Kipps, Jr., Washington, D. C., for plaintiffs. Miller & Chevalier, Washington, D. C., of counsel.

Philip R. Miller, Washington, D. C., with whom was Acting Asst. Atty. Gen. Richard M. Roberts, for defendant. C. Moxley Featherston, Lyle M. Turner, and Philip I. Brennan, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This income tax case, relating to the six years 1945 through 1950, was referred to Trial Commissioner W. Ney Evans with directions to make appropriate factual findings and to submit his recommendation for a conclusion of law. The commissioner has filed a report containing findings, an opinion, and a recommended legal conclusion. Exceptions have been taken, briefs filed, and oral argument had. The ultimate issues are: (1) whether, apart from the defense of collateral estoppel, the defendant has sustained its burden of showing that Mr. Armstrong committed fraud in filing his tax returns for these years; (2) whether plaintiffs have shown that the taxes assessed against them (exclusive of fraud penalties) were erroneous; and (3) whether plaintiffs are collaterally estopped, by a prior criminal conviction, from arguing that Mr. Armstrong committed fraud in his returns for 1947, 1948, and 1949. The commissioner's answers to these inquiries were that the Government had failed to prove that Mr. Armstrong committed fraud; that the plaintiffs had likewise failed to prove any error in the basic taxes assessed against them; and that the doctrine of collateral estoppel was inapplicable in the circumstances of this case. The defendant challenges the first and third of these conclusions; the plaintiffs accept the second in part.

On the first two of these issues the court adopts the portion of Commissioner Evans' opinion which deals with these questions. His conclusion results almost entirely from his evaluation of Mr. Armstrong as a person, in the past as well as the present—as gleaned from the latter's testimony before the commissioner, from Mr. Armstrong's life and background, and from the evidence pertaining to Mr. Armstrong's dealings with his tax responsibilities and problems, especially in 1945 through 1950. Giving due weight to the commissioner's opportunity to appraise Mr. Armstrong, his testimony, and the evidence of his past actions, the court sees no basis for overturning the trier's factual determination and evaluation and therefore accepts them. That part of the commissioner's opinion, together with the preliminary discussion, appears in Part I of this opinion (with minor changes). The court's views on the legal issue of collateral estoppel (which differ from those of the commissioner) are set forth in Part II. Our ultimate conclusion on the whole case is contained in Part III.

I

Commissioner Evans' opinion, except for the discussion of collateral estoppel, is as follows (with minor changes):

Taxpayer [1] seeks by this action to recover deficiency assessments and alleged overpayments of income taxes for the years 1945 through 1950. The defense alleges that for each of the 6 years in question plaintiff filed false or fraudulent income tax returns in an attempt to evade taxes properly due and owing.

The petition was filed on June 10, 1960. Theretofore, on April 13, 1955, taxpayer had been convicted under a three-count indictment of having willfully attempted to defeat and evade income taxes owed the United States by filing false returns for the 3 years 1947, 1948, and 1949. A fine of $500 per count was thereafter imposed.

When the present action came on for pretrial proceedings, the allegation of *res judicata* in defendant's answer to the petition was presented and considered in terms of collateral estoppel, i. e., whether or not plaintiff was estopped to deny fraud for the years 1947–1949 or to present evidence in support of such a denial.

At that time and later, when the case was brought to trial (in November 1963), well-reasoned precedents were divided sharply on the application of collateral estoppel. Under the circumstances, ruling on the question was reserved, and the trial proceeded pursuant to an understanding that the Government, having the burden of proving fraud, might adduce evidence of fraud as to any or all of the years in question, and the plaintiff might seek to refute any such evidence offered by the Government. Moreover, plaintiff was permitted, under this arrangement, to adduce evidence of overpayment of taxes for all years (including the years 1947–1949) in contemplation of the finding for which he contends that there was no fraud in any of the 6 years at issue in this suit.

In recent months (being since the conclusion of the trial of the instant case), the Tax Court of the United States has reversed field categorically and now is in accord with the Court of Appeals holding that collateral estoppel does apply. As a consequence, the overwhelming weight of authority now favors the position initially taken by the Government that plaintiff's prior conviction for having willfully attempted to defeat and evade income taxes lawfully due operates as an estoppel to preclude him from denying fraud for the years 1947–1949 or from presenting evidence in support of such a denial.

Meanwhile, the case has been tried pursuant to the ruling reserved and the understanding above recited, and the at-

1. As noted in finding 1, this suit is concerned altogether with the actions and claims of the plaintiff, O. K. Armstrong. The joinder of Mrs. Armstrong as a plaintiff is a formality, resulting from the filing of a joint return for the year 1950. References to the claimant are in the singular throughout the findings and in this opinion.

torneys for the parties have submitted their requested findings of fact and their briefs on the law in conformity with the trial record as made. Since it is manifestly impossible to unscramble the omelet and apply collateral estoppel in pristine form *nunc pro tunc,* the findings of fact have also been prepared in conformity with the trial record as made, reserving the application of the law for the formal conclusion.

■■ The conclusions which I have reached as findings of ultimate fact on the basis of the evidence are, on their face, contradictory. On the issue of fraud, as to which the defendant has the burden of proof, my conclusion is that defendant has failed to sustain the burden as to any year in issue; while on the issue of overpayment of taxes, as to which plaintiff has the burden of proof, my conclusion is that plaintiff has failed to carry the burden for lack of credibility. The facts will explain this paradox.

Plaintiff's father was a Baptist minister who held a pastorate at Willow Springs, Missouri, at the time his son was born, shortly before the turn of the century. The father later held pastorates in other small towns in southwest Missouri, at one of which (Carterville) plaintiff completed the eighth grade and was graduated from high school.

Plaintiff attended Drury College, in Springfield, Missouri, majoring in education and psychology, and was graduated with a bachelor of arts degree. He taught school for a year, and was in the military service for 2 years during World War I. Upon his release from the service, he studied law at Cumberland University, in Tennessee, receiving his degree in 1922. He was duly admitted to practice in Missouri, but elected instead to turn to journalism. He took a master's degree in journalism from the University of Missouri.

For 3 years during the late 1920's he taught journalism at the State University of Florida. He was caught up in the Florida land speculation of that era and incurred losses when the boom collapsed. He assumed personal responsibility for some of these losses, and completed payment of the debts in 1946.

In 1929, plaintiff returned to Missouri and became active in the Baptist Church and the Republican Party. He was elected to the Missouri General Assembly in 1932, 1934, and 1942, and to the House of Representatives of the United States Congress in 1950, where he served one term. Meanwhile, in 1938, he served by appointment of the Governor as an investigator of alleged corruption (gambling, racketeering, and prostitution) in Jackson County (Kansas City), Missouri.

While living in Florida, plaintiff, began a career as a free-lance writer. Upon his return to Missouri, in 1929, he continued writing part time, but devoted most of his efforts during the first 2 or 3 years to teaching at Drury College and serving as its alumni director, and later to the duties of public office, elective or appointive.

In 1938, he began writing articles for the Reader's Digest, on assignment or on speculation, and in 1944 was appointed an editorial staff writer with the status of expenses and remuneration for those of his articles which the magazine accepted for publication. He continued in this status during the years at issue in this suit (1945–1950) and thereafter. Sizable portions of his gross income during these years came from articles accepted for publication by the Reader's Digest and from the reimbursement of expenses incurred in the writing of such articles. He also wrote for other publications, and has written at least two books.

Two of his articles have concerned taxation, dealing primarily with efforts to lower taxes. In 1946, he was appointed chairman of an advisory committee created by the Senate Committee on Post Office and Civil Service, and has since described this assignment as being related to "the Senate Study on Taxation," although his duties were more concerned with the possibility of lowering the cost of Government operations with

a view toward the consequent reduction of taxes.

During the 10 or 12 years material to this action (from 1944 through 1955), plaintiff was active (1) in civic affairs, being a member of the Kiwanis Club, the American Legion, and the Chamber of Commerce in his home town of Springfield, Missouri; (2) in church work, as a member of the University Heights Baptist Church, and as chairman and member of various regional councils and associations engaged in Baptist-related civic and social action; and (3) in politics, local and state, affiliated with the Republican Party.

Plaintiff is an intelligent man, well educated, highly literate and just as highly emotional. He speaks with great clarity, and his utterances carry the impression of careful thought and earnest sincerity. These qualities are fully reflected in his success as a lay leader in the Baptist Church, a field in which he is widely known and highly regarded, and in his effectiveness as a political leader, a field in which he is also widely known and often regarded as controversial.

In 1945, plaintiff's family consisted of himself, his wife, and five minor children whose ages then were 20, 18, 12, 6 and 5. Mrs. Armstrong died in 1947. Plaintiff remarried in 1949.

During the years in controversy, plaintiff used a room in his home as his office. In it he kept his research materials, manuscripts, and other records relating to his work, including invoices for articles, reimbursement statements, and those parts of the family records for which he assumed responsibility.

His work took him out of town frequently, sometimes for extended periods. During 1945 and 1946, Mrs. Armstrong paid the household bills and some of the business bills. After her death, the two older sons looked after payment of the bills. Plaintiff himself consistently paid some of the business bills and looked after some of his records. His filing system, however, if he had one, was proved by later experience to be woefully deficient. Neither the family nor the business records, such as receipts, canceled checks, bank statements, insurance policies, and tax returns were ever organized into a coherent or usable system.

Plaintiff's income, during the years here involved, was derived from the proceeds of his writing (magazine articles and books), from fees and honorariums for lectures, from salary payments for teaching, and from payments for special assignments in the fields of church work and political activity. Each of these activities (other than teaching) involved expenses for travel, for which he was usually reimbursed.

During each of the years 1945–1950, inclusive, plaintiff timely filed income tax returns, Form 1040, with the Collector of Internal Revenue, Kansas City, Missouri, and paid the amounts of the tax liability shown on the returns at the time the returns were filed. Summaries of these returns appear on Table 1, incorporated in finding 36.

On each of these returns plaintiff started with adjusted gross income, without explanation or schedules showing how he arrived at the figures. He then subtracted his (personal) deductions to arrive at net income, from which he subtracted his exemptions to derive the taxable income, on which he computed his tax liability.

Following are his entries of adjusted gross income and tax liabilities:

| Year | Adjusted Gross Income | Tax Liability |
|---|---|---|
| 1945 | $4,262.00 | $101.54 |
| 1946 | 5,219.50 | 120.24 |
| 1947 | 5,235.00 | 20.93 |
| 1948 | 5,514.00 | 86.69 |
| 1949 | 4,889.25 | 6.57 |
| 1950 | 4,641.55 | 21.94 |
| Totals | $29,761.30 | $357.91 |

The Forms 1040 for 1945, 1946, 1947, and 1948 were done in longhand. Those for 1949 and 1950 were typewritten. Each was dated by the taxpayer as having been signed by him within the week preceding the filing date of March 15. The four forms done in longhand

gave the appearance of sketchiness and hurry.

In the fall of 1950, an office audit of taxpayer's 1949 tax return was made by the Audit Branch of the Internal Revenue Service, Kansas City office. In that return, taxpayer had listed, under Exemptions, himself and 7 other persons (his wife, his mother, and his 5 children), and had claimed 6½ exemptions.[2] While the audit of his 1949 return was pending, his 1948 return was assigned to another auditor in the Kansas City office of the Internal Revenue Service. Both auditors made requests of taxpayer for further information.

While these requests were outstanding, the auditors had occasion to examine records in a Springfield bank on other matters. One of them took the opportunity to look at some of the records of plaintiff's bank account. He made a mental note of the indication he found of checks having cleared through plaintiff's account as deposits, the totals of which appeared to exceed by considerable amounts the adjusted gross incomes reported by plaintiff. These impressions were later confirmed by more detailed examination of the bank records.

As requests for information by representatives of the Internal Revenue Service in Kansas City increased, plaintiff requested that the investigation of his returns be transferred to Springfield. The transfer was made in January 1951, the month in which plaintiff took his seat in Congress. The investigation in the Springfield office, of plaintiff's income tax returns for 1948 and 1949, was assigned to Revenue Agent John C. Boals.

Agent Boals reexamined the bank records, with plaintiff's 1948 and 1949 returns in hand, and found from the bank's ledger sheets that total deposits to plaintiff's account in each of the years 1948 and 1949 materially exceeded the amounts recorded on plaintiff's returns as adjusted gross revenue. He reported his findings to his superior in the Springfield office, who forwarded the information to the Kansas City office where the Intelligence Division officially assigned Special Agent Almer A. Ridge to work with Revenue Agent Boals in making an investigation.

In response to an invitation from Agent Boals, plaintiff went to the Internal Revenue Service office in Springfield on April 23, 1951, to discuss his returns for 1948 and 1949 with Agents Boals and Ridge. The details of this and several other meetings between plaintiff and the revenue agents are set forth in the findings,[3] as are details of the results of the investigation,[4] and of additional inconsistencies.[5]

Plaintiff appears to have had no adequate conception, before he met with the revenue agents on April 23d, of the nature or depth of the interrogation to which he was to be subjected. From the agents' standpoint, the interrogation was a routine effort to obtain information with which to explain plaintiff's returns. Plaintiff took umbrage at the agents' endeavors, and the meeting ended in a strained atmosphere. The agents construed plaintiff's resentment as reflecting a lack of cooperation on his part, and forthwith launched a full investigation which ultimately was extended to cover his income tax returns for the years 1945–1950.

Before his next meeting with the agents, plaintiff satisfied himself that the investigation of his tax returns was not politically inspired and, when he again met with the agents on May 9, 1951, he so advised them and apologized for his anger at the previous interview. Thereafter, his attitude was one of cordiality and cooperation and, when the

---

2. He had remarried in December 1949. His mother had lived at his home during 6 months of 1949. He made no claim of an exemption for his wife, and claimed only 6 months on account of his mother. All this was explained in an attachment.

3. Findings 13–26.

4. Findings 27–30.

5. Findings 31–34.

interviews ended, in April 1952, he expressed the belief that he had been treated fairly during the investigation.

In the course of the yearlong investigation, the two revenue agents (1) assembled from outside sources as much information as possible concerning payments made to plaintiff for writing, lectures, teaching, and political activities; (2) made exhaustive analyses of the bank records; (3) interviewed plaintiff intermittently; (4) obtained from plaintiff such of his canceled checks, receipts, and "work papers" as he could locate; (5) made a check spread, in the preparation of which plaintiff participated; and (6) reconstructed his income as best they could by the established methods known as the specific items method and the net worth method.

While the evidence does not warrant the conclusion that plaintiff was willfully uncooperative in supplying to the agents his receipts, canceled checks, and "work papers," the fact remains that the production of these records was a slow process. The inferences to be drawn from the evidence as a whole are (1) that, for lack of a coherent, usable filing system, plaintiff could not assemble these papers readily; (2) that plaintiff produced such papers as he could find, as he found them, in the hope each time that his latest effort would suffice; and (3) that plaintiff never, during the course of the investigation, took the time to make a thorough search to turn up at one time all of the records in his possession. The production of canceled checks, for example, went on piecemeal throughout 9 months of the year of investigation.

The progress of the investigation was further impeded by recurrent discoveries by the agents that statements made by plaintiff at one interview were inconsistent with statements made by him on the same subject at a prior interview. The agents' experience with plaintiff's so-called "work papers" is illustrative of this impediment.

On one occasion the agents went to plaintiff's home, at his request, to pick up some papers. There plaintiff handed to them a set of typewritten notes relating to his income taxes for the years in question. On. the table one of the agents saw still other notes, in penciled form, also apparently relating to income taxes for the same years, and asked if he might have them. Plaintiff gave them to him.

Conflicts in the evidence concerning the conversations between plaintiff and the agents at the time have been resolved by the conclusions (1) that plaintiff had prepared the typewritten notes the night before, to give to the agents; (2) that these notes represented plaintiff's efforts to reconstruct the figures which he had entered as income on his returns; (3) that the penciled notes had been used by him in preparing the typewritten sheets; (4) that the penciled notes had been prepared by him at various earlier times; (5) that none of the sheets (typed or penciled) was an original work sheet used by him in the preparation of his returns; and (6) that he did not tell the agents that the notes were original work sheets in the context mentioned, although Special Agent Ridge understood him to mean just that, and so did Agent Boals until sometime later when he had had opportunity to reflect upon plaintiff's insistence that no such statement had been made.

Subsequent examination of the two sets of notes indicated that there was very little, if any, relation between them except that both sets related to items with which plaintiff's income tax returns were concerned, although the agents had correctly understood plaintiff to say that the penciled notes had been used by him in the preparation of the typed sheets. The agents' subsequent examination of the two sets of notes revealed that their most graphic characteristics were conflict and inconsistency, as summarized in the findings.[6]

---

6. Findings 31–35.

The agents' confusion over plaintiff's inconsistencies was compounded by his ability, heretofore noted, to speak with clarity and precision, evidencing the assurance of conviction as well as sincerity and rectitude. An illustration of this situation is depicted in the agents' testimony relative to the preparation of the check spread.

By December 1951, enough canceled checks had been assembled to warrant the preparation of the check spread. Plaintiff went to the agents' office on December 13 to participate in this endeavor. The agents had already prepared a chart, with a breakdown of subjects to which separate checks might be allocated. Plaintiff was asked to examine each check and to indicate the category in which it belonged. The three men worked all day at the undertaking, and succeeded in making an agreed allocation of most of the checks. The agents were impressed by plaintiff's positive attitude in making the check identifications. He seemed to them never to be vague in his recollection as to the purpose of any check to which he gave an allocation.[7]

At plaintiff's final interview with the agents, before the close of the investigation, they told him that their analysis showed his true income for the period 1945 through 1950 to be approximately $50,000 instead of the approximate $20,000 figure he had reported on his original income tax returns.[8]

The agents' reconstruction of plaintiff's income by the specific items method is summarized in Table 1 (finding 36). According to that reconstruction, plaintiff's adjusted gross income for the 6 years in question was slightly in excess of $56,500, whereas the total of adjusted gross income reported by plaintiff on his returns was just under $29,800. The difference between these figures of approximately $26,700 represents an increase of 89.6 percent over the amount reported by plaintiff. As heretofore noted, plaintiff did not report a figure for gross income. The agents' specific items reconstruction of income began with a total gross income of $89,800, from which the adjusted gross income figure was derived by subtracting allowable expenses in the amount of $33,300.

The trial computations (also summarized in Table 1) upon which plaintiff predicates his requested findings of fact list gross income of $84,700, from which he would deduct expenses of $38,500 to arrive at adjusted gross income of $46,200. Thus, the difference between the parties as reflected by the evidence upon which they now rely to show actual, corrected figures may be summarized as follows:

| | Gross income | Allowable expenses | Adjusted gross income |
|---|---|---|---|
| Defendant ...... | $89,800 | $33,300 | $56,500 |
| Plaintiff ....... | 84,700 | 38,500 | 46,200 |
| Difference ...... | $5,100 | ($5,200) | $10,300 |

Plaintiff, it will be noted from the foregoing, has increased his own original figure for adjusted gross income by $16,400, or 55 percent.

The final interview with the agents was on April 21, 1952. It was at this time that plaintiff told the agents he thought he had been treated fairly in the investigation. In recognition of their advice that their estimates of his income were appreciably larger than the figures shown on his returns, plaintiff told the agents, as he had told them once before, that he was preparing amended returns which would show his correct income and expenses, but that before he filed such returns he wanted to go over them with a lawyer in Washington who represented

---

7. Plaintiff, in his testimony at the trial of the case, challenged the validity of the check spread on the ground that he could not have recalled, with accuracy, the purpose of so many checks written so long before.

8. The total income reported by plaintiff on his original returns was almost $30,000, instead of $20,000.

the Reader's Digest. This lawyer had advised plaintiff in previous interviews that the payments to him by the Reader's Digest of $2,500 in 1949 and $5,000 in 1950 were bonuses and not gifts as plaintiff had told the agents he believed them to be when he made out his original returns. These payments, plaintiff told the agents, would be reported as income in his amended returns.

On August 12, 1952, plaintiff forwarded to the Collector of Internal Revenue at Kansas City amended income tax returns for the years 1946–1950.[9] These returns are summarized in Table 1 (finding 36). A forwarding letter explained in great detail the methods used in preparing the amended returns and assured the Collector that—

* * * these reports are as complete and as accurate as is humanly possible to make them, to my knowledge and belief.

In the amended returns plaintiff reported gross income for the 5 years totaling $71,600, from which he subtracted $27,900 in allowable expenses, to arrive at adjusted gross income of $43,700. The latter figure compares with $25,500 reported as adjusted gross income for the same 5 years on his original returns, a difference of $18,200, reflecting an increase over his initial figure of 71.3 percent.

Following is a comparison of totals reflected by plaintiff's amended returns with totals for the same years from figures upon which the parties now rely as reflecting the true situation:

| | Gross Income | Expenses | Adjusted Gross Income |
|---|---|---|---|
| Defendant's T.C.[1].. | $77,700 | $28,100 | $49,600 |
| Amended Return.. | 71,600 | 27,900 | 43,700 |
| Difference ...... | $ 6,100 | $ 200 | $ 5,900 |
| Plaintiff's T.C.[1]... | 73,100 | 39,300 | 33,800 |
| Amended Return .. | 71,600 | 27,900 | 43,700 |
| Difference ..... | $ 1,500 | $11,400 | ($9,900) |

With his amended returns plaintiff remitted to the Collector of Internal Revenue $3,857.20, representing his calculation of the difference between the taxes previously paid for 1946–1950 and the taxes shown by the amended returns to be due, plus interest. It does not appear from the evidence what acknowledgment or reply, if any, the Collector of Internal Revenue made to plaintiff. It is established that the amount remitted by plaintiff was placed in an escrow account by the Collector, where it remained until after the assessment of deficiencies and penalties, whereupon plaintiff was given credit for payment on account.

Following is a comparison of the total tax liability for the years 1946–1950, as shown on plaintiff's original returns, with the total tax liability for the same years as shown (1) by plaintiff's amended returns of 1952; (2) by defendant's computation; and (3) by the trial computation on which plaintiff now relies: Computation: *Amount*

| | |
|---|---|
| Plaintiff's Original Returns ................. | $256.37 |
| Plaintiff's Amended Returns ................. | 3,500.84 |
| Defendant's Trial Computation ............... | 7,113.74 |
| Plaintiff's Trial Computation .................... | 1,552.85 |

In summary, defendant contends that plaintiff initially underpaid his taxes by some $6,800, while plaintiff, although admitting his original returns reflected underestimates, now says he has since overpaid the amount properly due by $2,000.

On March 1, 1954, almost 2 years after the agents completed their investigation and 18 months after plaintiff had filed amended returns, plaintiff (accompanied by counsel) attended a meeting in the office of the United States Attorney in Kansas City, at which Agents Boals and Ridge were also present. Details of the discussions which took place are not in

---

9. At this time, plaintiff apparently did not realize that his 1945 return was in issue.

1. "T.C." means Trial Computation.

evidence. It does appear, however, that when plaintiff was questioned about his original returns and the work papers used in their preparation, he averred that no such work papers had ever existed.[10] Agent Boals asked if it were not true that the expenses plaintiff had applied against each article had been mental calculations. Plaintiff's attorney said the expenses did not represent mental calculations, but estimates, and plaintiff agreed that this was true.

Ten days later, on March 11, 1954, the fraud indictment against plaintiff was returned. Plaintiff suffered a nervous breakdown shortly thereafter, and ascribes the indictment as its cause.

A year later, on April 13, 1955, he was brought to trial and was convicted, on all three counts, of willful evasion of taxes for 1947, 1948, and 1949. Two months later, on June 13, 1955, a fine of $500 per count was imposed.

On August 1, 1955, plaintiff filed claims for refund of amounts paid with the amended returns in the sum of $2,172.02 in tax, and $612.81 in interest. These claims for refund were rejected by the Commissioner of Internal Revenue.

On November 8, 1957, a deficiency was assessed against plaintiff for the year 1950, and 6 months later, on May 23, 1958, deficiencies were assessed for the 5 years 1945 through 1949. On November 4, 1958, plaintiff paid the assessments, including tax, penalties, and interest in the sum of $12,022.66. On November 17, 1958, plaintiff filed claims for refund for the 6 years 1945 through 1950, in the amount of $11,708.32. These claims for refund were likewise rejected. The petition was filed in this court on June 10, 1960.[11]

In December 1961, plaintiff submitted to defendant, in connection with the present litigation, a proposed stipulation of tax computations and liability for the years 1945–1950. These computations are summarized in Table 1 (finding 36). They were prepared by the attorney who first represented plaintiff in the present litigation. This attorney had access to plaintiff's original and amended returns and to *pro forma* returns for 1947–1949 (summarized in Table 1) prepared for plaintiff by a firm of auditors.[12] In resolving the inconsistencies between these items of source material, he had to depend upon information and advice from plaintiff. Against this background, the attorney exercised his professional skill and judgment in determining the validity of such items as claimed exemptions, professional expenses (reimbursed and unreimbursed), and allowable personal deductions.

In a deposition taken by defendant in 1962, plaintiff supported in detail the recollection and recall by which he had advised the attorney who prepared the proposed stipulation.

The attorney who represented plaintiff at the trial of the action in November 1963 has prepared still another computation, which is fully presented in his requested findings of fact. These computations are summarized in Table 1 (finding 36).

The trial attorney also exercised his professional skill and judgment in determining the validity of such items as pro-

10. The significance of this statement lay in the fact that Special Agent Ridge was positive that plaintiff had proferred the notes described in finding 18 as original work papers. So, apparently, was Agent Boals at this time.

11. This petition sought recovery of $14,223.50, representing $12,053.89 allegedly due as a result of the deficiency assessments and $2,169.61 allegedly due as a result of overpayments of tax reported on the amended returns. No reconciliation of the minor variations in figures re-

flected herein is in evidence. A second amended petition asks for a total of $15,315.14, of which $3,261.25 represents alleged overpayments. In his requested findings of fact, plaintiff computes the amount of the recovery to which he is entitled as $15,240.62.

12. Plaintiff employed the auditors to prepare the *pro forma* returns in anticipation of his meeting with the United States Attorney on March 1, 1954, to whom he gave copies of these tax computations.

fessional expenses (reimbursed and un-reimbursed), claimed exemptions, and allowable personal deductions. Although he had access to the original returns, the amended returns, the *pro forma* returns, and the proposed stipulation, he too had to depend upon information and advice from plaintiff concerning receipts and disbursements and other source material.

At the trial of the action, plaintiff once more supported in detail and with firm conviction the recollection and recall by which he had advised the trial attorney, although there were manifest inconsistencies between his trial testimony and statements made by him previously.

Of the six tax computations summarized in Table 1, the first five represent computations prepared by or for plaintiff: (1) his original returns; (2) his amended returns; (3) the *pro forma* returns; (4) the proposed stipulation; and (5) the trial computation. Each one of the five computations reflects in large measure plaintiff's recollection and recall as recorded by him during the years 1946–1951, in the preparation of his original returns; during 1952 for the amended returns; during 1954 for the *pro forma* returns; during 1961 and 1962 for the proposed stipulation; and during 1963 for the trial computation. This situation reflects the importance of an accurate appraisal of plaintiff's reliance on recollection and recall. Such an appraisal has been attempted in finding 45, the text of which follows:

"When plaintiff prepared his original returns, during each of the years 1946–1951, the records he had before him were meager, scattered, and sketchy. The subsequent investigation of his tax returns, begun in April 1951 and carried over into April 1952, compelled him to assemble more records: canceled checks, receipts, invoices, and other current notations of many transactions. He had the benefit of these in the preparation of his amended returns, filed in August 1952, and this benefit was a carryover for the auditors who prepared the *pro forma* returns in 1954. After the fraud conviction in 1955, plaintiff persevered further in the assembly of records for the years in issue. By the time of the preparation of his proposed stipulation in 1961, he had assembled as much of his recorded data as could reasonably be expected. Even so, his recollection and recall continued to be refined during the preparation of his trial computations in 1963.

"Plaintiff's memory was freshest at the time he prepared his original returns. In the preparation of his amended returns, he had before him for reference a fair portion of his full record assembly, and in point of time he was only 1 year removed from the preparation of his 1950 return and 5 years from the preparation of his 1946 return. He appears to have relied rather heavily upon his 1952 review in advising the auditors who prepared the *pro forma* returns in 1954. By 1961–1963, when his proposed stipulation and trial computations were prepared, he was 10 to 12 years removed from his original return for 1950 and 15 to 17 years removed from the original return for 1946. He nevertheless asks the court to accept his later handiwork in preference to his earlier efforts.

"Plaintiff's recollection and recall are materially involved in each of the five tax computations he has submitted over the years. The vagaries of the computations are matched by inconsistencies and contradictions in the statements he has made at various times based on his recollection and recall. Throughout these statements, however, there is one consistent thread: intelligence, rationality, and assurance, expressed in language calculated by its sincerity to be informative and helpful.

"When the revenue agents worked with plaintiff on the check spread, they were impressed with his positive attitude in making check identifications. He seemed to them never to be vague in his recollection as to the purpose of the checks. When plaintiff submitted his amended returns in 1952, he assured the Collector that 'these reports are as complete and as accurate as is humanly possible to make them, to my knowledge and belief.' The auditors who prepared the *pro forma*

returns in 1954 were assured of the reasonableness of their conclusions by their discussions with plaintiff. His deposition in support of the proposed stipulation and his testimony in support of his trial computations are in similar vein. His two attorneys had been as much assured as had his auditors by discussions with him. The trial commissioner, who presided at the trial, saw no indication of dissembling or concealment in plaintiff's demeanor as a witness.

"Surely, a hurried review of the many inconsistencies and contradictions· in plaintiff's various computations and explanatory statements would suggest that he is, at the least, careless with the truth or, at the worst, a congenital liar. Either inference would be both superficial and erroneous. The only conclusion that will stand the test of careful analysis is that, by some strange and unusual psychological quirk, plaintiff was able to believe and did sincerely believe in the truth of each statement as it was made.

"The appraisal therefore follows that plaintiff's reliance on his recollection and recall is compulsive. His appearance as a witness demonstrated that on any occasion he is ready and willing, almost eager, to address himself to any question or matter affecting his recollection and recall, and to do so without hesitation or reflection."

██ It is this appraisal which accounts for the seemingly contradictory conclusions recorded at the outset of this opinion. Defendant has failed to carry the burden of proving fraud because there is insufficient evidence of scienter or wrongful intent. Plaintiff has failed to carry the burden of proving overpayment of taxes because his statements are unreliable. One statement is as plausible as another, and there is insufficient objective evidence to warrant the acceptance of one in preference to another.

Defendant has laid great stress, at the trial and in its findings and brief,

upon plaintiff's failure to report as income (in his initial returns): (1) the two bonus payments he received from the Reader's Digest ($2,500 in 1949 [13] and $5,000 in 1950); (2) the gift to him in 1947 of an automobile by Mr. R. G. Le Tourneau; and (3) payments made to plaintiff by Mr. Le Tourneau which defendant contends represented either money earned (royalties) or reimbursement of expenses and which plaintiff says were gifts.

Mr. Le Tourneau was identified by plaintiff as head of the Le Tourneau Foundation and as "the well known Christian layman," who asked plaintiff in 1944 to collect material for a book, in the course of which plaintiff was to travel extensively. Plaintiff continued to be engaged in one assignment or another for the Le Tourneau Foundation for 3 or 4 years. It was in 1947 that Mr. Le Tourneau told plaintiff of his desire to give plaintiff a 1946 automobile. Plaintiff later received the car and, when questioned about it, said it was a gift and he had regarded it as such.

One may discount, as products of an intuitive rationalization of self-interest, plaintiff's statements that he regarded the various beneficences of Mr. Le Tourneau and the Reader's Digest as gifts. As such, his statements might be subject to challenge for lack of basic veracity. The evidence fully warrants the conclusion that, where his self-interest is concerned, plaintiff possesses a generous capacity for intuitive rationalization. Against any challenge of his basic veracity in the exercise of that capacity, however, at least in the present context, there must be set his lifelong environment in the Baptist Church, as the son of a minister and as a lay leader dealing constantly with the Baptist ministry.

His background will have special significance to anyone familiar with the historical development of the financial mores of the Protestant denominations in an economy as relatively meager as

---

13. The failure to report this payment was a factor in the trial for criminal fraud.

Armstrong v. United States, 228 F.2d 764, 8th Cir., 1956.

that of southwest Missouri.[14] Donations by wealthy laymen, to supplement inadequate ministerial stipends, and even to substitute for honorariums or the reimbursement of expenses for which the congregation had not made (perhaps could not make) provision, were not uncommon expressions of Christian charity.

The evidence, therefore, does not warrant a conclusion that plaintiff was lacking in basic veracity when he regarded these beneficences as gifts rather than income.[15]

As authority for the imposition on plaintiff of fraud penalties for the years 1945–1950, defendant relies on the provisions of section 293(b) of title 26, United States Code, 1952 edition, the text of which follows: [16]

> (b) *Fraud.* If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).

Defendant's brief refers to " * * * the meaning given to the term 'fraud' as it is used in civil tax fraud cases such as the instant controversy," as follows:

> "Fraud implies bad faith, intentional wrongdoing and a sinister motive." Davis v. Commissioner of Internal Revenue, 184 F.2d 86, 87, 22 A.L.R.2d 967 (C.A. 10th), cited with approval by this Court in Olinger v. Commissioner of Internal Revenue, 234 F.2d 823, 824 (C.A. 5th). "The fraud meant is actual, intentional wrongdoing, and the intent required is the *specific purpose to evade a tax* believed to be owing." (Emphasis supplied.) Mitchell v. Commissioner of Internal Revenue, 118 F.2d 308, 310 (C.A. 5th).

Intent is a state of mind. That the state of a man's mind is as much a fact as the state of his digestion is axiomatic. Whereas objective tests might be made of one's digestive apparatus, measures of mental state are almost wholly subjective and therefore quite difficult of application.

In the instant case, the bulk of the evidence which might tend to establish wrongful intent consists of the contradictions and inconsistencies attributable to plaintiff since his tax returns came under investigation. Such contradictions and inconsistencies would be entitled to considerable weight as supporting the inference of wrongful intent in the absence of satisfactory explanation of or excuse for them. As matters stand, they are fully explained, and the inference of wrongful intent which might otherwise be drawn is altogether negated by the explanation.

14. The writer [Commissioner Evans] is a native of the region, and grew to maturity there. He had never met plaintiff, however, prior to the trial of the case.

15. While it cannot be denied that plaintiff reasonably should have known that the payments by Reader's Digest were bonuses and not gifts, neither can it reasonably be found that he did know the difference.

In the stage portrayal of Lightnin' by George M. Cohan some years ago, Lightnin' solemnly averred that he had once driven a swarm of bees across the country and never lost a bee. Who is to say, knowing Lightnin', that he did not believe what he said?

16. The whole of section 293 was derived from the Act of May 28, 1938, ch. 289, § 293, 52 Stat. 541. In the original enactment, the concluding phrase of § 293(b) read " * * * in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended." Otherwise, the text (of the whole section) is identical in 52 Stat. 541 and in 26 U.S.C., 1952 edition. The Internal Revenue Code of 1939 substituted for "section 3176 of the Revised Statutes, as amended," the words "section 3612(d) (2)" which appear in 26 U.S.C., 1952 edition. 53 Stat. 88. The latter provision, section 3612(d) (2), provides: "*Fraud.* In case a false or fraudulent return or list is willfully made, the Commissioner shall add to the tax 50 per centum of its amount." 53 Stat. 438; 26 U.S.C., 1952 ed., § 3612(d) (2).

The explanation of plaintiff's contradictions and inconsistencies, as derived from the appraisal of his reliance on recollection and recall, does not fully account for the fact that plaintiff materially underestimated his tax liabilities for the years 1945–1950 in his initial returns. This fact reflects his capacity for intuitive rationalization of self-interest in a slightly different context, where it is once more subject to challenge for basic veracity.

Whereas plaintiff reported in and paid with his initial returns a total tax liability of $360, he now admits, in his trial computation, that his total tax liability was $1,800, an increase of 400 percent. Percentagewise, this is not an inconsiderable variation.[17]

In the preparation of his original returns, plaintiff, as heretofore noted, had no adequate system of records. Each year (1945–1950) as the March 15 deadline approached, he would assemble some notes of his income from writing and from the rents received from his two apartments, and occasionally of income from another source or two, together with various indicia of his contributions, interest, taxes, and medical expenses. Taking up each item of income from writing or lecturing, he would estimate the expenses incurred in connection with that item, deduct the estimate from the receipt, and enter the difference as part of his adjusted gross income. By dint of this method he never made a schedule of gross income or of expenses incurred, reimbursed or not.

The Instructions applicable at the time required him to attach a schedule of expenses. The expenses were not otherwise required to be entered on the returns. Plaintiff, however, never read the Instructions. One of the most curious facts of record is that, throughout all the grief plaintiff has had from this tax situation, including the preparation of five sets of tax computations, he had never, up to the time of trial, carefully read or studied the Instructions that go with the Form 1040. Neither did he employ counsel or auditors to assist him with either his original returns or the amended returns filed in 1952. He relied, instead, on a smattering of information obtained from interviews with Internal Revenue staff and conversations with other people.

Surely, plaintiff was no paragon taxpayer.[18]

The federal income tax system is one of self-assessment. Its efficiency must depend largely on the truth of facts set out by the taxpayer in his return. And, appropriately geared to the gravity of nondisclosure (or false disclosure), Congress has provided sanctions, both civil and criminal, to protect that system. Implicit in the working of the system is an obvious duty of keeping proper records imposed on the taxpayer. * * * [Halle v. Commissioner of Internal Revenue, 175 F.2d 500 (2 Cir. 1949), cert. denied 338 U.S. 949 (1950); 70 S.Ct. 485; 94 L.Ed. 586].

As early as 1938 there was a statutory requirement that "[e]very person liable to any tax * * * shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner * * * may from time to time prescribe."[19]

---

17. Defendant contends that, in conformity with its reconstructions of income, the total tax liability was $8,000, an increase of 2,222 percent.

18. Every careful, conscientious taxpayer is entitled to look with a jaundiced eye upon the carelessness and indifference displayed by plaintiff's ilk, since his own rendition to Caesar may be more than it might be except for such carelessness and indifference.

There is a penalty for deficiencies resulting from negligence or intentional disregard of rules and regulations "without intent to defraud." 26 U.S.C. § 293 (a) (1952 ed.). But negligence is not fraud.

19. Act of May 28, 1938, ch. 289, § 54, 52 Stat. 477. Cf. § 6001, Internal Revenue Code of 1954, title 26, United States Code.

The thrust of this requirement has been subjected to continuous refinement for upward of 30 years. The taxpaying public has become increasingly aware of the requirement and its importance, particularly since the substantial increases in income tax rates, beginning with the higher rates of 1941–1942. The withholding of income tax at the source was begun in 1943,[20] but it applied only to "wages," defined as "remuneration * * for services performed by an employee for his employer."[21] Taxpayers subject to such witholding were required to declare in advance their estimates of tax for the ensuing year, and to pay the tax in installments.[22] The sobering effects of these requirements are known to all who then had to estimate and pay their taxes in advance.

Plaintiff, however, was not one of these. As a freelance writer and lecturer, he was primarily in the category of independent contractor rather than employee. As a consequence, he missed the discipline of the withholding and estimating procedures.[23]

█ Whether or not the failure to keep records adequate for tax purposes is, in and of itself, evidence of fraudulent intent depends upon the nature of the evidence. There are cases both ways. For illustration, see Safra v. Commissioner of Internal Revenue, 30 T.C. 1026 (1958)[24] and Goldberg v. Commissioner of Internal Revenue, 239 F.2d 316 (5 Cir. 1956).[25]

In the instant case, plaintiff's failure to keep adequate records, even when coupled with his failure to report substantial amounts of income and the taking of improper deductions for travel and other business expenses, fail to provide the "clear and convincing evidence" requisite to prove fraud, because (if for

20. Act of June 9, 1943, ch. 120 § 2(a), 57 Stat. 126.

21. 26 U.S.C. § 1621, Supp. III, 1940 ed.

22. 26 U.S.C. §§ 58, 59, Supp. III, 1940 ed.

23. Plaintiff was subjected to withholding by the State of Missouri in connection with his salary as a member of the State legislature in 1943–1944. Moreover, among the penalties assessed against him by the Commissioner of Internal Revenue was one for failure to file an estimate of tax.

24. The Commissioner assessed a civil fraud penalty against the taxpayer under the Internal Revenue Code of 1939, § 293 (b). Taxpayer was an optometrist who kept a single-entry ledger in which he entered at the end of each year a summary of his annual income and expenses. He also had extensive transactions in real estate mortgages during the years involved, 1943–1948. In determining the factual issue of intent to evade taxes, the court said (p. 1036): "A strong indication of petitioner's intention is found in the consistent pattern of understatements of income over a period of years"; and "[t]he failure on the part of petitioner to maintain adequate books and records, *when coupled with other evidence of record*, provides convincing evidence of his fraudulent intention to evade taxes." [Emphasis supplied.]

25. The Tax Court upheld the Commissioner's assessment of a civil fraud penalty under § 293(b) on the basis of the facts (1) that taxpayer had taken a bookkeeping course; (2) that she did not retain permanently supporting documents, did not keep a general ledger with investments nor with accounts receivable and payable, but relied on a single-entry bookkeeping system; (3) that she failed to report income from an estate, gain from the sale of timber, and gain from the sale of an automobile; (4) that improper deductions were repeatedly taken for taxes, travel, and legal expenses; and (5) that there were large amounts of unreported income. The Court of Appeals reversed, saying (p. 321): "The matters mentioned and other circumstances reflected in the record do not, singly or in the aggregate, meet the measure of proof which is required on the fraud issue. The fraud which the Commissioner was required to prove to sustain the penalty is actual and intentional wrongdoing with a specific intent to evade the tax. Mitchell v. Commissioner of Internal Revenue, 5 Cir. 1941, 118 F.2d 308. It is never imputed or presumed, and findings of fraud should not be sustained upon circumstances which at most create only suspicion. * * *" At another point (p. 320) the court said: "The Commissioner has the burden of proving fraud by clear and convincing evidence."

no other reason) the evidence as a whole points to another, more logical inference.

Reference has been made above to the disciplines resulting from the withholding and advance estimation of income taxes, with which the majority of the taxpaying public had to become acquainted during the war and the years immediately following it. With respect to plaintiff, it is reasonable to say, on the basis of the record as a whole, that these disciplines caught up with him (or he with them) only as a result of the investigation of his tax returns in 1951–1952. His reaction to the situation in which he found himself was clearly one of dismay. Not only did he not understand at the outset what was happening to him, he appears not to have understood even at the time of trial. Certainly, his attitude toward his conviction on a charge of criminal fraud remained, at the time of the trial of the instant, civil action, one of incredulity and disbelief that any such thing could have happened to him.

In the view which I take of the evidence in this case, plaintiff is completely absolved of intent to evade taxes within the meaning of section 293(b).

## II

At the time this case was tried, there was a split of authority as to the binding effect of a prior conviction for wilful tax evasion upon a civil proceeding for tax fraud. On this issue of collateral estoppel, plaintiff's trial attorney asserted in his brief to the trial commissioner that "the criminal conviction for the years 1947, 1948, and 1949 is not collateral estoppel on the issue of fraud for those years, but rather is only evidence from which the inference of fraud may be drawn if not explained," citing Vassallo v. Commissioner, 23 T.C. 656 (1955), Safra v. Commissioner, 30 T.C. 1026 (1958), and several other Tax Court decisions so holding. His brief continues: "The sole case to the contrary is Lefkowitz v. Tomlinson, (D.C.Fla.1962),

11 AFTR 2d 617, pending on appeal." Plaintiff's brief was filed on March 18, 1964. On July 13, 1964, the Court of Appeals for the Fifth Circuit decided Lefkowitz, and the case was cited in defendant's brief to the trial commissioner, filed July 21, 1964. Lefkowitz is reported in 334 F.2d 262, cert. denied, 379 U.S. 962, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965). Sidney Lefkowitz had been convicted of felonious evasion of income taxes for the years 1951–1953. He and his wife sued to recover the penalties that had been assessed (and paid) for civil fraud. The court concluded "that the issue of the existence of a fraudulent intent is foreclosed by collateral estoppel arising from Sidney's conviction under section 145(b)." 334 F.2d at 266.

On October 21, 1964, the Tax Court held, in Amos v. Commissioner, 43 T.C. 50, that:

> In the instant case imposition of the civil penalty * * * depends upon a determination of the ultimate fact that petitioner's underpayment of tax for the years 1955 through 1958 was due to fraud. This ultimate fact for determination herein is the same ultimate fact which was determined adversely to petitioner in the prior criminal proceeding. It is therefore our decision that petitioner is conclusively bound, under the doctrine of collateral estoppel, by that prior adverse determination. Tomlinson v. Lefkowitz, 334 F.2d 262 (C.A. 5, 1964), affirming an unreported case (S.D.Fla.1962).

The Tax Court then proceeded to distinguish Vassallo and to overrule Safra. The Amos holding was followed by the Tax Court in another decision of the same date: Arctic Ice Cream Company v. Commissioner, 43 T.C. 68. Five Tax Court judges dissented from Amos, in favor of retaining the court's former rule that a prior conviction is only evi-

dence of civil fraud, and does not work an estoppel.[26]

At the present time, therefore, the weight of the authority which has passed on the issue favors the proposition that a prior conviction for tax evasion operates as a collateral estoppel on the issue of civil fraud in a fraud penalty proceeding. But during the trial there was no such preponderance and, as indicated in the portion of Commissioner Evans' opinion set forth in Part I, supra, a ruling on the application of collateral estoppel was reserved as the trial opened because of the serious conflict between the decided cases. The parties proceeded pursuant to an understanding that evidence might be offered as to years involved in the criminal proceeding as well as the years not so involved. After the trial, and while the parties' requested findings of fact and briefs were pending consideration by the trial commissioner, the conflicts among the decided cases were reduced by the full Tax Court's action in reversing its field.

Without disagreeing with the Fifth Circuit or the Tax Court, Commissioner Evans was of the view that the ends of justice would not be served by application of collateral estoppel in these circumstances, now that he had heard all the evidence pertaining to all six years and had determined that Mr. Armstrong had no intent to defraud the Government during any of those years. In large part, the commissioner's view was founded on the position that application of the estoppel doctrine, at the outset, would have precluded any evidence as to the three years covered by the criminal conviction (1947, 1948, 1949), and that it would not serve justice to apply collateral estoppel *nunc pro tunc* and excise all of this evidence.

■ The court takes a different position. We fully agree with the commissioner in his original opinion that "the nature of the evidence is such that deter-mination of the fraud issue rests upon an analysis of the taxpayer's course of conduct over a period of years" and that "the pattern of taxpayer's course of conduct" could only become clear through evidence extending over the whole six-year period. All the evidence was necessary for such an appraisal. We do not agree, however, that—in a case like this in which the determination of the taxpayer's intent depends on an evaluation of a prolonged course of conduct—application of collateral estoppel would preclude the admission or consideration of evidence relating to the years covered by the prior criminal conviction. That evidence would be admissible and relevant because of its bearing on the taxpayer's intent during the three years still open. Taxpayer would be estopped from seeking an adjudication that he was innocent of fraud in 1947, 1948, or 1949, but he would not be estopped from seeking such an adjudication for 1945, 1946, and 1950, or from introducing evidence relating to the barred years in order to show his intent for the three years as to which he would not be estopped. Accordingly, we consider the trial commissioner's procedure at the trial to have been correct, as was his consideration of all the evidence (for all the years) in determining the state of the taxpayer's mind for the years as to which the plaintiffs are not estopped.

■ The question remains whether the estoppel doctrine should now be applied, despite the commissioner's independent findings of no fraud, to 1947, 1948, 1949—the years in which the jury found that there was wilful evasion. It is true that there has been a full *de novo* trial, and properly so in this case, but we do not think this retrial is a sufficient reason to reject the defense of collateral estoppel. That doctrine rests not only on the desire to avoid repetitious trials but just as firmly on the need to avoid conflicting adjudications (involv-

26. In Moore v. United States, 235 F.Supp. 387, 392–393 (W.D.Va., Aug. 7, 1964). the district court disagreed with the Lef-kowitz decision, preferring the earlier Tax Court rulings (which had not then been overruled).

ing the same parties), as well as the need to put an end to controversies. The jury in the criminal action determined that Mr. Armstrong had committed a fraud in 1947, 1948, and 1949. That determination was embodied in a judgment which was affirmed and has become final. Whatever we may now think or say of the correctness of the jury's finding, we should not issue a diametrically opposed *adjudication* to compete with and contradict that earlier one. If possible, the same parties should not be subject to conflicting determinations on the same point, both of which are binding. Moreover, the reasons for the retrial in this case do not counsel a lifting of the estoppel bar as to the years governed by the criminal verdict. It would discriminate against other taxpayers to hold that these particular plaintiffs obtain an advantage because the law as to collateral estoppel was unclear in 1963 and the first half of 1964, or because it was necessary in this particular instance to admit all the proffered evidence in order to determine taxpayer's intent in the three years left untouched by the earlier decision. These are fortuitous happenstances which should not control the operation of the defense.

There may be cases in which deference to the prior adjudication is properly refused, but this is not one. The evidence before the district court was largely (though not entirely) the same as that before us, and the balance between the opposing judgments of the jury and of our trial commissioner is indeed close. There is no miscarriage of justice in holding taxpayer to the jury's finding for the years included in the criminal trial.

Plaintiffs argue, also, that the Fifth Circuit and the Tax Court were wrong in finding a component of fraud in the crime of willful tax evasion. We agree, however, with those courts and disagree with Moore v. United States, supra, 235 F.Supp. 387, 392–393 (W.D. Va., 1964). For the reasons given in the opinions in Lefkowitz, Amos, and Arctic, we hold that the issue of fraud was necessarily litigated and decided in the criminal case. The Supreme Court ruling on which plaintiffs mainly rely, United States v. Scharton, 285 U.S. 518, 521–522, 52 S.Ct. 416, 76 L.Ed. 917 (1932), rested on the special need for narrow construction of an excepting clause relating to a criminal statute of limitations; the reach of Scharton, moreover, has been severely limited by United States v. Grainger, 346 U.S. 235, 240–244, 76 S.Ct. 1069, 97 L.Ed. 1575 (1953).

The result is that, despite the trial commissioner's finding as to Mr. Armstrong's lack of fraudulent intent, plaintiffs cannot have an adjudication that Mr. Armstrong committed no fraud in 1947, 1948, and 1949. For those years the judgment in the prior criminal case is decisive.

### III

On the whole case our conclusion is that plaintiffs are entitled to recover the deficiencies, penalties, and interest assessed against them for alleged fraudulent returns for the years 1945 and 1946, and fraud penalties for 1950. Judgment is entered to that effect and the amount of recovery will be determined under Rule 47(c). Plaintiffs are not entitled to recover the deficiencies, penalties, and interest assessed against them for fraudulent returns for the years 1947, 1948, and 1949; nor are they entitled to recover alleged overpayments of taxes for the years 1945–1950, inclusive; as to these portions of their claim the petition is dismissed. The counterclaim is dismissed.[27]

---

27. In its briefs, defendant asks judgment on its counterclaim for $955.50 (the amount of Mr. Armstrong's fine, in the criminal case, which is alleged to be still unpaid). But the trial commissioner made no findings on this point, and defendant did not except to this omission. There is therefore no basis for a judgment on the counterclaim.