UNION CARBIDE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3687–76.   Filed November 12, 1980.

*Fred W. Peel, John F. Mooney,* and *Robert D. Heyde,* for the petitioner.
*Stanley J. Goldberg* and *C. Clinton Stretch,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1971 in the amount of $636,773. By amended answer, respondent increased this deficiency to the amount of $913,652.

Two issues are involved herein: (1) Whether the solvent extraction process, as applied by petitioner to the minerals vanadium and tungsten, was a mining process within the meaning of section 613(c)(4)(D)[1] for the purpose of computing petitioner's percentage depletion allowance and, if solvent extraction should be found to be a nonmining process, whether subsequent processes should necessarily be classified as nonmining under section 1.613–4(g)(2), Income Tax Regs.; and (2) whether petitioner erroneously computed the foreign tax credit allowance with respect to Western Hemisphere Trade Corporation members (hereinafter WHTCs) of petitioner's affiliated

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year at issue.

group of corporations; this issue was raised by respondent's amended answer and involves a purely legal question, including the application of the doctrine of collateral estoppel.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of facts and exhibits are incorporated herein by this reference.

Union Carbide Corp. (hereinafter petitioner) is a New York corporation which had its principal office in New York, N.Y., at the time of the filing of the petition herein. Petitioner kept its books and records and filed its U.S. corporate tax returns utilizing the accrual method of accounting. For the taxable year ended December 31, 1971, petitioner and its affiliated corporations filed a consolidated income tax return with the District Director, Manhattan District, New York, N.Y.

### FINDINGS OF FACT

### *Issue 1. Depletion Allowance*

Petitioner is engaged in numerous commercial business activities, including the mining and processing of low-grade ores containing minerals such as uranium, vanadium, tungsten, copper, and molybdenum. In 1971, operations at issue herein (involving vanadium and tungsten) were conducted in petitioner's plants located at Rifle, Colo.; Hot Springs, Ark.; and Bishop (Pine Creek), Calif., at each of which locations petitioner had mines. The ores extracted from all three mines were low-grade ores requiring additional processing to concentrate the desired minerals before shipment for industrial use. While the content of the ores processed at these operations varied, the operations were similar in that, during the processing cycle at each location, petitioner utilized the hydrometallurgical process of solvent extraction or ion exchange to recover concentrates of the minerals from the low-grade ores. The solvent extraction circuits at Rifle, Hot Springs, and Bishop were typical of the design and application of the solvent extraction process within the mineral industry.

The processing at each plant resulted in the ultimate recovery of a concentrated form of the desired mineral or minerals after separating it from the gangue (worthless rock in which the mineral occurs) and other impurities in the extracted ore.

## Rifle Plant

At the Rifle plant, petitioner processed ore containing vanadium and uranium.[2]

In 1971, five products[3] were obtained at the Rifle, Colo., plant from uranium-vanadium ores. These products were (a) ammonium metavanadate (AMV)[4] accounting for 1.4 percent of vanadium-related production, (b) technical flake vanadium pentoxide (fused $V_2O_5$) accounting for 32.6 percent of vanadium-related production, (c) a technical granular $V_2O_5$ accounting for 4.5 percent of vanadium-related production, (d) a modified vanadium oxide (MVO) accounting for 62 percent of vanadium-related production, and (e) uranium in the form of ammonium diuranate (yellow cake).[5]

The processes applied in 1971 at the Rifle plant to obtain vanadium products from all the mill feed (the ore initially fed into the processing cycle) are listed below.[6]

(a) *Ore preparation (crushing, grinding, pelletizing).*—The ore and slag processed contained about 2.5-percent equivalent $V_2O_5$[7] and about 0.15-percent uranium. This mixture became the

---

[2]The Internal Revenue Service was aware that, during 1971, the petitioner employed solvent extraction in processing its uranium ore at its Rifle and Uravan plants. The Internal Revenue Service allowed the petitioner to treat solvent extraction for uranium at the Rifle and Uravan plants as a mining process within the meaning of sec. 613(c)(4)(D) for purposes of computing depletion. See Letter to Senate from Stanley S. Surrey, Assistant Secretary of the Treasury (Sept. 19, 1961), 107 Cong. Rec. 20192—20193 (1961).

[3]The word "products" is used herein in a general sense and does not imply the application of either mining or manufacturing techniques.

[4]The vanadium, recovered as AMV at Rifle, is a compound containing approximately 43-percent "pure" vanadium. The equivalent $V_2O_5$ content of AMV is approximately 77 percent. $V_2O_5$ is vanadium pentoxide. See note 7 *infra.*

[5]Yellow cake is a generic term which applies to certain uranium concentrates. It is the final precipitate formed in the milling process. It is usually considered to be ammonium diuranate or sodium diuranate. The composition is variable and depends on the precipitating conditions. See Bureau of Mines, A Dictionary of Mining, Mineral and Related Terms (1968).

[6]The parties agree that processes a, b, c, and d are mining processes within the meaning of sec. 613. The parties also agree that process h is a nonmining process. Thus, the processes at issue are processes e, f, and g. See also pp. 226-227 *infra* in respect of process i (uranium recovery).

[7]Vanadium commonly takes the form of vanadium pentoxide ($V_2O_5$), both as a natural compound and a synthetic compound. Reference to the $V_2O_5$ content in a vanadium compound is the standard practice for stating the mineral content of the compound. "Equivalent $V_2O_5$" refers to the vanadium content of a material calculated by measuring the amount of V (vanadium) present and applying a mathematical formula based on atomic weights to determine how much of that material would be $V_2O_5$ if all the V in the material were present as $V_2O_5$. $V_2O_5$ is a compound that contains approximately 50-percent vanadium.

millfeed which was crushed and ground in several steps. Then, ferric vanadate containing 30-percent $V_2O_5$ obtained from petitioner's plant at Uravan, Colo., was added to the ore.

(b) *Salt (sodium sulfate) roast.*—Sodium sulfate was mixed with the ore. The ore mixture was then roasted in a kiln at 850 degrees Celsius to convert a major portion of the vanadium to water-soluble sodium vanadate compounds. Until the mixture of sodium sulfate with the ore, the ore did not contain a significant amount of sodium. Sodium, at this point, is considered an impurity. The purpose of the roast is to combine the vanadium in the ore with sodium to form a water-soluble sodium vanadate. The addition of sodium is necessary in order to make the desired mineral susceptible of being solubilized.

(c) *Water quenching and leaching.*—The roasted ore (calcines) from the kiln was water leached so that water-soluble sodium vanadate compounds were taken into solution. This solution was then separated by countercurrent decantation, a liquid-solid separation process in which the ore solids are separated from the solution which contains the valuable mineral and discarded. The solids, gangue, and other waste, amount to approximately 98 percent of the total volume of solids in the kiln feed. The separated solids included non-water-soluble uranium and non-water-soluble vanadium that were subsequently processed by subjecting them to an acid leach in a parallel uranium processing line (step i below). The vanadium solution at this point contains 2-percent $V_2O_5$. There is no commercial or industrial use for the solution at this point.

(d) *pH adjustment, gypsum precipitation, and clarification.*— The water leach liquor was then combined with the recycled raffinate or uranium-barren liquor from the uranium solvent extraction circuit (step i below) and the filtrate from the AMV filtration circuit (step f below). The pH was adjusted to near 2.5 percent to precipitate gypsum and other impurities from the solvent extraction feed solution. The solution was clarified by settling out the precipitated gypsum, leaving a solution containing a 1.6-percent equivalent $V_2O_5$ content.

The solid material removed in the gypsum precipitation step was subjected to a sulfuric acid leach to resolubilize the vanadium. The vanadium that was recovered was recycled back into the main processing line for the solubilized vanadium.

(e) *Vanadium solvent extraction.*— The solution remaining after the gypsum precipitation contained a mixture of the water

leach liquor, AMV filtrate, and the uranium-barren raffinate from the uranium solvent extraction. This mixture was combined and pH adjusted (step d above). This solution became the feed used in the vanadium solvent extraction circuit.

The aqueous feed solution contained the mineral molecules which existed as ionic fragments. These ions were free to move about in the solution. These ions would be attracted toward electrodes if a voltage drop was impressed. This feed solution was mixed with a solvent solution containing the following:

> 92-percent kerosene
> 5-percent tertiary amine
> 3-percent isodecanol

The kerosene was the carrier of the tertiary amine, which acted as the extractant. During the extracting stage, the organic solvent flowed in the opposite direction (countercurrent) to the aqueous feed containing the vanadium to be extracted. The amine became bonded with the vanadium ions thereby extracting them from the feed solution. It required a chemical reaction to make this bond. The vanadium ions were then stripped from this organic solution by mixing it with another aqueous solution containing sodium carbonate. The vanadium ions were stripped from the solvent as sodium vanadate. The raffinate from this solvent extraction circuit was discarded as waste.

The stripping stage of the solvent extraction circuit concentrated the vanadium by increasing the equivalent $V_2O_5$ content of the solution from approximately 1.6 percent to approximately 15 percent. The solvent extraction circuit excluded several undesired minerals, which were in the ore as mined. Water and such chemicals as sodium sulfate, which had been introduced into the ore during salt roasting, leaching, and gypsum precipitation were also removed by this process.

The specific change in the levels of contaminents present in the feed before and after the solvent extraction circuit at Rifle was as follows:

|  | Presolvent extraction | Postsolvent extraction |
|---|---|---|
| Sulfate ion | 2.50% | 0.30% |
| Chlorides | 0.30% | 0.10% |

| Calcium | 0.14% | < 0.10% |
| Molybdenum | 0.10% | 0.16% |
| Iron, aluminum | < 0.10% | Trace |
| Magnesium, ammonia | | |

If the solvent extraction process had not been used, removal of these impurities as well as concentration and separation of the desired mineral could have been accomplished by utilizing dissolution and multiple (at least two) precipitation steps.

(f) *pH adjustment and precipitation of AMV.*— The vanadium product liquor (sodium vanadate) which resulted from the solvent extraction circuit (containing 15 percent $V_2O_5$) was then mixed with ammonium hydroxide, and then heated to raise the pH of the solution. This was done to convert the decanvanadate ions to metavanadate ions prior to precipitation.

Ammonium sulfate was then added to the solution. The solution was cooled to precipitate ammonium metavanadate (AMV). This AMV precipitate was recovered by filters. The AMV precipitate contained approximately 77 percent $V_2O_5$. The remaining filtrate, containing approximately 1-percent equivalent $V_2O_5$, was recycled through the vanadium solvent extraction circuit.

(g) *Washing and drying.*— The AMV precipitate was washed and dried at approximately 50 degrees Celsius to remove free water. This drying would have been required if multiple precipitations had been used in place of solvent extraction. In 1971, there was no vanadium product, suitable for commercial or industrial use, produced prior to AMV.

(h) *Subsequent vanadium processes.*— Approximately 1.4 percent of the AMV was packaged and shipped without further treatment. Approximately 32.6 percent of the AMV was converted into technical grade vanadium pentoxide (fused $V_2O_5$) by heating it in a fusion furnace to decompose the AMV and to drive off the ammonia. Approximately 4.5 percent of the AMV was converted into technical granular $V_2O_5$. Approximately 62 percent of the AMV was processed in a reactor to produce a modified vanadium oxide.

(i) *Uranium recovery processes.*— After the water leach (step c above), the uranium recovery system at Rifle was conducted in parallel, but separate, steps from the primary vanadium processing line. After the water leach had solubilized most of the vanadium in the ore, the solids separated from the water leach

liquor were subjected to an acid leach to dissolve the uranium and the non-water-soluble vanadium values. The acid-leach product liquor was then pH adjusted and clarified. It was combined with the product liquor from the gypsum leach, the mixture becoming the feed to the uranium solvent extraction circuit. The uranium in solution was extracted from the feed liquor in a solvent extraction process that was substantially the same as the vanadium solvent extraction circuit.

The raffinate from this process, containing approximately 0.9-percent equivalent $V_2O_5$, was mixed with the water leach liquor and the AMV filtrate entering the vanadium solvent extraction circuit. The product liquor from uranium solvent extraction was treated by adding sodium hydroxide to cause the precipitation of sodium diuranate (yellow cake). The yellow cake was filtered, washed, and dried.

The yellow cake was then calcined and packaged. The dried yellow cake had an 85-percent equivalent $U_3O_8$ content.[8]

Processing operations for vanadium and uranium ore at Rifle, Colo., have been conducted by petitioner since the 1930's and 1940's. Petitioner began to utilize the solvent extraction process with respect to vanadium in 1957. The "new" Rifle plant represented one of the first vanadium solvent extraction operations in use in the Nation. As early as 1956, the process was recognized as one of the best for extraction of minerals because of the use of inexpensive extractants such as kerosene.

Prior to installation of the solvent extraction circuits, the "old" Rifle plant[9] recovered vanadium from the ore in three forms: Sodium hexavanadate (red cake), containing approximately 83- to 86-percent equivalent $V_2O_5$; ammonium hexavanadate (orange cake), containing approximately 89- to 90-percent equivalent $V_2O_5$; and ammonium metavanadate (AMV), containing approximately 43-percent equivalent $V_2O_5$. The initial processing at the "old" Rifle plant, from crushing and grinding

---

[8]During 1971, respondent allowed petitioner to treat solvent extraction for uranium at the Rifle and Uravan plants as a mining process within the meaning of sec. 613(c)(4)(D) for purposes of computing the deduction for depletion. There is no disagreement between the parties that, with one exception, all of the steps in the uranium recovery process constitute mining processes. The exception involves the calcination and packaging of the yellow cake, which the parties agree is a nonmining process. See also note 2 *supra*.

[9]"Old" and "new" Rifle plant are designations of the parties referring to preuse and postuse of the solvent extraction process.

through water leaching, was essentially the same as the initial processing in the Rifle plant utilizing solvent extraction. Without solvent extraction, however, several precipitation steps[10] would have been required at the "old" Rifle plant to recover vanadium in the form of AMV or orange cake.

The AMV produced at "old" Rifle and the AMV produced utilizing the solvent extraction process were essentially the same product. Solvent extraction was viewed as preferable to multiple precipitations because it was less expensive, required less capital investment in machinery, produced a higher recovery and was, overall, a simpler process. Solvent extraction took the place of the dissolution and precipitation of red cake in the making of AMV at the "old" Rifle plant.

The uranium processing line at "old" Rifle, like the vanadium processing line, employed multiple precipitations to recover uranium in the form of yellow cake. After an acid leach, the vanadium in solution was treated with sodium carbonate and ferrous sulfate to precipitate out ferric vanadate, which was recycled through the vanadium processing line. The uranium-rich filtrate, remaining after the ferric vanadate precipitation, was again treated with sodium carbonate to precipitate aluminum, silica, iron, and other hydrates which were discarded. Then, in a third precipitation step, either ammonium or sulfuric acid was added, and heat was applied to precipitate uranium as ammonium diuranate (yellow cake).

### Hot Springs Plant

At the Hot Springs, Ark., plant, the petitioner processed vanadium ore from its mines, together with purchased slags and residues. The ore extracted from the Hot Springs mine con-

---

[10]The specific precipitation steps were as follows:

(a) Sodium hexavanadate (red cake) was precipitated from the water leach liquor by adding sulfuric acid and applying heat. Red cake at this stage contained approximately 83- to 86-percent equivalent $V_2O_5$;

(b) (1) Part of the red cake was processed in a fusion furnace to produce a fused vanadium oxide known as black cake;

(2) Part of the red cake was dissolved in ammonia, and then, sulfuric acid was used to precipitate ammonium hexavanadate (orange cake);

(3) Part of the red cake was dissolved using ammonium. AMV was precipitated from the resulting liquor by adding ammonium chloride to the solution;

(c) A portion of the orange cake precipitate was treated in a fusion furnace to produce a fused vanadium oxide product.

tained approximately 1.02-percent equivalent $V_2O_5$. In 1971, the processes utilized at Hot Springs to recover vanadium as AMV were essentially the same as the processes employed at the Rifle plant. The differences were due to the composition of the ore. At Hot Springs, the mined ore did not contain uranium. The Hot Springs plant was constructed in 1959 with a solvent extraction circuit for the recovery of vanadium. As at Rifle, the vanadium could have been recovered by using multiple precipitations in lieu of solvent extraction.

At Hot Springs, the feed to the solvent extraction circuit contained 0.93-percent $V_2O_5$. Following the solvent extraction process, the liquor had a 3.7-percent $V_2O_5$ concentration level.[11] Following crystallization, the level of $V_2O_5$ increased to 50 percent. After drying, this increased to a 77-percent concentration of $V_2O_5$.

The feed contained a decavanadate ion (which entered the solvent extraction circuit as sodium decavanadate). After solvent extraction, ammonia and sulfuric acid were used as stripping agents resulting in the crystallization of ammonium metavanadate (still containing the decavanadate ion) out of the solution. Overall, solvent extraction accomplished a three- to six-fold concentration of the mineral as well as the exclusion of undesired minerals and chemicals. The sodium excluded during solvent extraction had been introduced during the salt-roast process.

Respondent has not contested the classification as mining processes of all processes at Hot Springs through countercurrent decantation (liquid-solid separation) and prior to the solvent extraction step.

*Bishop Plant*

At the Bishop plant, the petitioner processed tungsten-copper-

---

[11]At Hot Springs, the level of contaminants present before and after the solvent extraction process was as follows

| | Presolvent extraction | Postsolvent extraction |
|---|---|---|
| Sulfate ion | 1.6 to 4.8% | |
| Sodium | 1.5% | |
| Chlorides | 2.0% | 0.1 to 0.4% |
| Potassium | 0.3% | |
| Phosphates, chrome Molysilica, iron Aluminum | Traces | Traces |

molybdenum ores and purchased or tolled tungsten ores and ore concentrates. The ore extracted from the Bishop mine contained approximately 0.6-percent equivalent $WO_3$.[12] The percentage of equivalent $WO_3$ in the plant feed was increased because petitioner also processed both purchased and tolled ore concentrates containing higher tungsten content.[13]

The desired minerals recovered at the Bishop plant in 1971 were in the form of copper concentrates, molybdenite concentrates, calcined blue oxide, the principal tungsten concentrate (ammonium paratungstate (APT)), and, during part of 1971, natural scheelite concentrates. APT contains approximately 70 percent tungsten. The equivalent $WO_3$ content of APT is approximately 89 percent.

The processes applied to obtain APT at the Bishop plant were as follows: [14]

(a) *Crushing and grinding.*—The mined ore was crushed in jaw and cone crushers and ground in rod and ball mills.

(b) *Flotation.*— The ground ore passed to sulfide flotation devices that separated small quantities of copper concentrates and molybdenite concentrates indigenous to the ore. Until September 1971, a small quantity (less than 10 percent of the total production) of natural scheelite concentrates was collected and removed from the feed by a gravity process following a scheelite flotation step. Beginning in September 1971, the petitioner ceased processing the ore to remove natural scheelite. The bulk of the ore, containing 10-to 15-percent equivalent $WO_3$, was passed to the digester for pressure leaching.

(c) *Pressure leaching of concentrates.*— After concentrates, produced by others,[15] were added to the scheelite flotation

---

[12]Tungsten commonly takes the form of tungstic oxide ($WO_3$), both as a natural compound and as a synthetic compound. Reference to the $WO_3$ content in a tungsten compound is the standard practice for stating the grade of the compound. "Equivalent $WO_3$" refers to the tungsten content of a material calculated by measuring the amount of W (tungsten) present and applying a mathematical formula based on atomic weights to determine how much of the material would be $WO_3$ if all the W in the material was present in the form of $WO_3$.

[13] The purchased ores and concentrates were approximately 8.5 percent of the total plant feed. The tolled ores and concentrates were approximately 8.5 percent of the total plant feed. Tolled ores are those for the use of which a royalty is paid. See Bureau of Mines, Dictionary of Mining, Mineral and Related Terms (1968).

[14]Of the processes listed, the parties agree that processes a through e are mining processes within the meaning of sec. 613. The parties also agree that processes f and i are nonmining processes. Thus, the processes in issue at the Bishop plant are processes g and h.

[15]These purchased or tolled concentrates contain $WO_3$ in a range between 25 to 65 percent.

concentrates (increasing the feed content of $WO_3$ to 15 to 20 percent), the concentrates were pressure leached in a digester using sodium carbonate to dissolve tungsten and molybdenum constituents. The digester used steam-induced heat and pressure to accomplish the leaching process. The purpose of this step was to get the tungsten into a water-soluble form.

This digester process performs substantially the same function in the tungsten process as the function performed by the salt roast and the water leach within the vanadium recovery circuit.

(d) *Liquid-solid filtration separation.—* The tungsten- and molybdenum-bearing leach liquor was separated from the remaining solids by filtration, and the liquor clarified. These remaining solids, normally representing 80 to 85 percent of the solids fed to the pressure leach, were discarded.

(e) *Molybdenum sulfide precipitation.—* Soluble sulfide and sulfuric acid were added to the leach liquor to cause the precipitation of molybdenum sulfide. The precipitate was filtered and dried. The tungsten-bearing filtrate was fed into the solvent extraction circuit. (See step g.)

(f) *Molybdenum sulfide oxidizing roast.—* The molybdenum sulfide was fed into a roaster and roasted to convert the molybdenum sulfide to molybdic oxide.

(g) *Tungsten solvent extraction.—* The tungsten-bearing filtrate, containing approximately 5-percent equivalent $WO_3$ (from step e above), was fed into the solvent extraction circuit. There, the feed (which contained the paratungstate ion) was mixed with an organic solvent (containing ditridecyl amine, isodecanol, and kerosene) which preferentially extracted the tungsten ions (paratungstate ions) from the feed, leaving a raffinate containing the sodium carbonate added in pressure leaching and molybdenum sulfide precipitation.

After separation of the solvent containing tungsten ions from the raffinate, an ammonium hydroxide solution was introduced to the solvent. This was done to strip the tungsten ions from the solvent. It produced a new aqueous solution containing tungsten in the form of ammonium paratungstate (APT). The solvent extraction circuit increased the percentage of equivalent $WO_3$ from approximately 3.7 percent to 18.6 percent.

In addition to converting the sodium tungstate to ammonium

paratungstate and increasing the concentration of APT, the solvent extraction process also excluded impurities.

In lieu of solvent extraction, the tungsten could have been recovered as APT by the following process: the feed liquor could have been precipitated, the concentrate resulting therefrom would then have been redissolved in hydrochloric acid, reprecipitated, filtered, and washed, and then redissolved in ammonia prior to crystallization out as APT.

(h) *APT crystallization.*— The product liquor from solvent extraction was subjected to steam to cause the crystallization of APT and to evaporate free water. The APT crystals were then collected by filters. The APT crystals were then washed and dried to remove free water. The resulting product was APT containing approximately 89.3-percent equivalent $WO_3$.

(i) *Subsequent tungsten processes.*— Most of the APT recovered from crystallization, filtering, washing, and drying was packaged and shipped. APT was the first tungsten product suitable for industrial use or consumption. Approximately 5 percent of the APT was calcined (roasted) to produce blue oxide.

The Bishop plant was operated for years before the tungsten solvent extraction circuit was installed in 1960. Prior to that time, the plant produced a synthetic scheelite or a calcium tungstate. Prior to the introduction of solvent extraction at the Bishop plant, petitioner utilized essentially the same processes from ore crushing and grinding through molybdenum sulfide precipitation as above. The tungsten-bearing liquor remaining after the precipitation of the molybdenum sulfide was treated with sodium hydroxide and calcium chloride to cause the precipitation of synthetic scheelite which was then filtered, washed, dried, and nodulized. The synthetic scheelite produced in this manner contained approximately 72- to 75-percent equivalent $WO_3$. The petitioner switched from production of synthetic scheelite, which contained calcium, to production of APT, which contains ammonia, because in order to compete in the industry it was necessary to produce a product containing ammonia.

## All Three Plants

The leaching processes performed by petitioner at Rifle, Hot Springs, and Bishop were essential in the mining of minerals such as uranium, vanadium, and tungsten. Leaching is the process of taking material from the ore so that it can be put into

solution as soluble ions. Leaching involves the extraction of metallic compounds from the low-grade ore by causing the desired substance to dissolve in an aqueous solution of acid, base, or salt in preparation for the separation of the solution from the solid residue. The desired mineral is placed in a solution to facilitate recovery and to isolate the then-soluble mineral ions from the unwanted gangue. The desired mineral could not be recovered in any way other than one which involves leaching. Pressure leaching involves the use of heat and pressure to intensify or speed up the separation.

During the separation phase of leaching (by means of countercurrent decantation or filtration), the solids are actually separated from the liquid phase.

It was necessary to use a salt roast prior to the leaching process. A water leach could not be effective without the salt roast because the addition of sodium during the roast was necessary in order to solubilize the vanadium or the tungsten during leaching.

The immediate product of leaching was a low concentration[16] of the desired mineral in a liquid form. Thus, subsequent to leaching at the Rifle, Hot Springs, and Bishop plants, it was necessary to concentrate the desired minerals by removing water and materials introduced during leaching. These materials were necessary for leaching but were considered contaminants in the leach products. It was necessary to return the desired mineral to solid form. This was accomplished by solvent extraction in combination with precipitation or crystallization. Concentration by solvent extraction or multiple precipitations was necessary in order to get the crystallization or precipitation to function.

Thus, leaching necessitated further processes to remove contaminants added in order to leach so as to remove water, and to convert the desired minerals back to solid form. These further processes included solvent extraction, precipitation or crystallization, washing, and drying.

Solvent extraction has been used in mining since approximately the end of World War II. It has been used to treat low-grade

---

[16]At Rifle, 2-percent equivalent $V_2O_5$; at Hot Springs, 0.93-percent equivalent $V_2O_5$; and at Bishop, 5.5-percent equivalent $WO_3$. The product liquor also contained amounts of contaminants.

ores in the recovery of uranium, beryllium, copper, vanadium, tungsten, tantalum, columbium, and zirconium. Solvent extraction is used in mining for the purpose of concentrating and separating a desired mineral from undesired constituents in the ore and from the water and chemicals which were applied in leaching.

The solvent extraction process applied by the petitioner to vanadium at the Rifle and Hot Springs plants and to tungsten at the Bishop plant was substantially the same as the petitioner's solvent extraction process applied to uranium at the Rifle plant. The solvent extraction process was applied to all three minerals for the purposes of concentration and separation of the minerals from contaminants.

The essence of precipitation is the formation of a solid out of a liquid. Both precipitation and solvent extraction are usually carried out by utilizing a water-based solution of the mineral. In this solution, the mineral molecules are present in the form of ions or fragments. These ions are free to move about within the solution. These ions would be attracted toward an electrode if a voltage drop were impressed across the solution. This is the same type of solution which would be used in a solvent extraction circuit.

In precipitation, a reagent is added to the solution causing a chemical change in the mineral molecules (which have a lower water-solubility level than the solution containing the reagent). This chemical change causes a grouping of the mineral molecules into a solid, i.e., bonding. This solid matter can then be physically separated from the residual liquid by settling, centrifuging, or filtering.

A series of precipitation steps can be utilized to increase the concentration (beneficiation) of the mineral.

In solvent extraction, beginning with the same type of solution as above, a solvent is added which contains a reagent. The mineral molecule is placed in an altered state by the use of an extractant which compounds with the mineral. Thus, as in precipitation, the mineral matter in solution is no longer in fragments or ions but is now bonded chemically with the extractant. Next, a separation of the liquid precipitate from the residual aqueous liquid is done by means of decantation and settling, centrifuging or contact with a semipermeable mem-

brane which will allow the aqueous liquid to flow through but will prevent the organic liquid from passage.

The principal difference between precipitation and solvent extraction is that in precipitation, the resultant mineral product is a solid, while in solvent extraction, the mineral is still in liquid state. Both are extracting processes.

At the "new" Rifle plant, the petitioner applied solvent extraction to vanadium and uranium as a substitute for the multiple precipitations previously used at the "old" Rifle plant. Using solvent extraction at all three plants, Rifle, Hot Springs, and Bishop, the petitioner recovered tungsten, uranium, and vanadium compounds. The compounds recovered were ammonium paratungstate (APT), sodium diuranate (yellow cake), ammonium metavanadate (AMV), and sodium hexavanadate (red cake); these compounds could have been recovered by employing multiple precipitation at the plants.

At Rifle, a precipitation step was utilized following the solvent extraction process. At Hot Springs and Bishop, crystallization was used. Different treatments were used due to the fact that different ore was involved at each site. Both processes were designed to achieve the same purpose, that is, to exclude the sodium and to take the desired mineral then in solution and convert it to solid form thus facilitating recovery and concentration of the desired mineral.

Spray drying is an alternative method of accomplishing this same purpose. Crystallization is a preferable method with respect to the amount of energy consumed by the processing.

The drying process, employed at the Rifle plant after precipitation and at the Hot Springs and Bishop plants after crystallization, was necessary to remove free water added to wash the precipitate or crystals recovered by filtration. Such filtration and washing were part of the precipitation or crystallization process. Drying did not change the chemical or physical identity of the minerals. Drying would have been necessary whether solvent extraction or multiple precipitations had been used.

During the period from 1958 through 1971, and up to the present time, the respondent has allowed the petitioner to treat the processes to produce yellow cake obtained by means of the uranium solvent extraction circuit at the Rifle plant as mining processes for percentage depletion purposes. See note 2 *supra*.

## OPINION

### *Issue 1. Depletion Allowance*

The principal issue in this case requires us to determine whether the solvent extraction process utilized by petitioner in the processing of vanadium and tungsten constitutes "mining" within the meaning of section 613 so that the income therefrom is subject to an allowance for depletion. Resolution of this issue involves the interplay of section 613(c)(4), and respondent's regulations thereunder,[17] and section 613(c)(5), and respondent's regulations thereunder.[18] These statutory provisions have their

---

[17]Sec. 613(c)(4)(D), which is repeated verbatim in sec. 1.613–4(f)(2)(i)(*d*), Income Tax Regs., provides:

(4) TREATMENT PROCESSES CONSIDERED AS MINING.— The following treatment processes * * * shall be considered as mining * * * :

\* \* \* \* \* \* \*

(D) in the case of lead, zinc, copper, gold, silver, uranium, or fluorspar ores, potash, and ores or minerals which are not customarily sold in the form of the crude mineral product— crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), *or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit;* [Emphasis added.]

The applicable regulation under this section (sec. 1.613–4(f)(4), Income Tax Regs.) provides in pertinent part:

(4) *Type of processes recognized as mining for ores or minerals covered by section 613(c)(4)(D).* Cyanidation, leaching, crystallization, and precipitation, which are listed in section 613(c)(4)(D) as treatment processes considered as mining, and the processes (or combination of processes) which are substantially equivalent thereto, will be recognized as mining only to the extent that they are applied to the taxpayer's ore or mineral for the purpose of separation or extraction of the valuable mineral product or products from the ore, or for the purpose of separation or extraction of the mineral or minerals from other material extracted from the mine or other natural deposit. A process, no matter how denominated, will not be recognized as mining if the process beneficiates the ore or mineral to the degree that such process, in effect, constitutes smelting, refining, or any other nonmining process within the meaning of paragraph (g) of this section. * * *

[18]Sec. 613(c)(5) provides:

TREATMENT PROCESSES NOT CONSIDERED AS MINING.— Unless such processes are otherwise provided for in paragraph (4) (or are necessary or incidental to processes so provided for), the following treatment processes shall not be considered as "mining": electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, *treatment effecting a chemical change,* thermal action, and molding or shaping. [Emphasis added.]

The applicable regulation under this section (sec. 1.613–4(g)(1), Income Tax Regs.) provides in pertinent part:

(g) *Nonmining processes—* (1) *General rule.* Unless they are otherwise provided for in paragraph (f) of this section as mining processes (or are necessary or incidental to processes

genesis in the so-called Gore amendment as enacted by section 302(b) of the Public Debt and Tax Rate Extension Act of 1960, Pub. L. 86–564, 74 Stat. 290 (hereinafter the Gore amendment).[19]

The parties are in agreement that both vanadium and tungsten fall under the category of minerals "not customarily sold in the form of a crude mineral product" and therefore are covered by sections 613(c)(4)(D) and 613(c)(5). Each of the parties has advanced a variety of arguments to sustain its respective position as to whether solvent extraction constitutes a mining process (as petitioner contends) or a nonmining process (as respondent contends), arguments involving highly technical analyses of the complex processes by which vanadium and tungsten are produced and equally technical parsing of the applicable statutory and regulatory language. We conclude that petitioner should prevail because solvent extraction constitutes a process "substantially equivalent" to precipitation and therefore should be considered as "mining" within the meaning of section 613(c)(4)(D). Alternatively, we conclude that solvent extraction is a process "necessary" to other mining processes and therefore falls within the exception to section 613(c)(5) and also constitutes "mining" within the meaning of section 613(c)(4)(D). See notes 17 & 18 *supra*.

Preliminarily, we note that our analysis (both as to the principal issue and as to certain of the other issues involved herein) is predicated upon two guidelines. First, as we stated in *Barton Mines Corp. v. Commissioner*, 53 T.C. 241, 254 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981 (2d Cir. 1971), we are convinced that:

although section 613(c) lists processes which shall and shall not be considered as mining, a mechanical application of the statutory language was not intended; we do not believe that Congress meant for us to embark upon the task of determining which of opposing parties' technical descriptions of a disputed

---

listed therein), the following processes are not considered to be mining processes—electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, treatment effecting a chemical change, thermal action, and molding or shaping. See subparagraph (6) of this paragraph for definitions of certain of these terms.

[19]The legislative history of the Gore amendment is thoroughly explored in the opinions of this Court and the Court of Appeals for the Second Circuit in *Barton Mines Corp. v. Commissioner*, 53 T.C. 241 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981 (2d Cir. 1971), and will not be repeated except to the extent deemed necessary to support or clarify our analysis herein. See also L. Sherfy, "Recent Developments in the Meaning of 'Gross Income from Mining' for Computation of Percentage Depletion," 6 Rocky Mtn. Min. L. Inst. 147 (1961).

process more precisely fits a statutory term. Rather, it is necessary to determine the function served by the particular process in question. * * *

Second, the "substantially equivalent" clause has been on the books, in the earlier statutory counterparts of section 613(c)(4)(D), since the enactment of section 124(c) of the Revenue Act of 1943, Pub. L. 78–235, 58 Stat. 21. When section 613(c)(4)(C), dealing with minerals customarily sold in the form of crude mineral products (a provision not involved herein) was enacted in 1960 as part of the Gore amendment, Congress went out of its way to include the "substantially equivalent" clause because "some statutory flexibility was deemed necessary to deal particularly with changes in the mining art." See 106 Cong. Rec. 14546 (1960). See also 106 Cong. Rec. 14513–14514. That Congress would consider it important to insert the "substantially equivalent" language where minerals sold in crude form were involved lends further emphasis to the importance of the language in section 613(c)(4)(D) dealing with minerals not customarily sold in crude form, since stricter standards were intended with respect to the former category of minerals. Cf. *Barton Mines Corp. v. Commissioner*, 446 F.2d at 996. Such action by the Congress tends to counteract, in the context of this case, respondent's attempt to impose a restrictive patina upon the intent of Congress in enacting the Gore amendment. In so stating, we recognize that Congress intended to make more specific the treatment processes which would qualify as "mining," but we think it important to note that this was done in an effort to distinguish between "where mining stops and manufacturing starts." See 106 Cong. Rec. 14547 (1960). We take a similar view of the legislative history of the "necessary or incidental" clause in section 613(c)(5). See *Barton Mines Corp. v. Commissioner*, 446 F.2d at 996, and 53 T.C. at 255.

Also as a preliminary matter, we note that we think the action of the Second Circuit Court of Appeals in reversing and remanding in part our decision in *Barton Mines Corp. v. Commissioner, supra*, has a minimal impact on our decision herein. The Court of Appeals did not deal with the applicability of the "substantially equivalent" clause contained in section 613(c)(4)(D)—an issue to which this Court made only passing reference. See 53 T.C. at 254. The main focus of the opinions of both the Court of Appeals and this Court was on the applicability of the "necessary or incidental" clause contained in section

613(c)(5) and, as we view the action by the Court of Appeals, its disagreement did not extend to the primary purpose or functional test which we applied but rather was confined to the articulation of the elements of that test. Since, as will subsequently appear (see pp. 243-244 *infra*), we are convinced that the petitioner herein has satisfied whichever articulation of that test is applied, we have no need to consider the extent to which we agree with the seemingly narrow articulation of the Court of Appeals (cf. *Casco Products Corp. v. Commissioner*, 49 T.C. 32, 37 (1967)) or the extent to which we may be bound to follow that articulation by virtue of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971).[20] *Barton Mines* and *Golsen* might have been involved in respect of respondent's position on the so-called "cut-off" rule, but any such interplay is nonexistent on this issue because this Court and the Second Circuit Court of Appeals are in agreement that respondent's position is without merit. See pp. 248–249 *infra*.

Against the foregoing background, we turn to the analysis of the reasons why we have concluded that petitioner should prevail.

In resolving the question of "substantial equivalence," a comparison must be made between the solvent extraction process and the process of "precipitation" in order to determine their similarities and dissimilarities. The word "precipitation" is a specified mining process in section 613(c)(4)(D) but is nowhere defined either in the statute or the regulation.[21] It appears,

---

[20]We note that *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971), specifically states that its applicability is limited to a situation where the decision of the Court of Appeals is "squarely in point" (see 54 T.C. at 757) and that it may, in any event, be inapplicable because this case involves treatment processes different from those involved in *Barton Mines Corp. v. Commissioner, supra*.

[21]By way of contrast, respondent's regulations define "concentrating" as used in sec. 613(c)(4)(C) to be "the process of eliminating substantial amounts of impurities or foreign matter associated with the ores or minerals in their natural state, or of separating two or more valuable minerals or ores, without changing the physical or chemical identity of the ores or minerals." Sec. 1.613-4(f)(3)(i), Income Tax Regs. This definition is adopted for purposes of sec. 613(c)(4)(D). See sec. 1.613-4(f)(4), Income Tax Regs. In its initial brief, petitioner argued that solvent extraction, viewed in isolation, was a "concentration" process, but it did not pursue that argument in its reply brief. See also *Ranchers Exploration & Development Corp. v. United States*, an unreported opinion (D. N.M. 1978, 42 AFTR 2d 78–5561, 78–2 USTC par. 9556). Since solvent extraction changes the physical form of vanadium and tungsten molecules from a solid to a liquid (although it does not change the identity of the vanadium or tungsten element itself), it may fall within the prohibition of respondent's regulation. Such being the case, and in view of the fact that our decision herein can be rested on other grounds, we find it unnecessary

however, that the precipitation process involves the formation of a solid out of a liquid by evaporation, cooling, or the addition of a reagent which causes the precipitation of one or more of the solutions' constituents. See Rev. Proc. 78–19, 1978–2 C.B. 491, 496. See also Bureau of Mines, A Dictionary of Mining, Minerals and Related Terms (1968); Webster's Third International Dictionary (1965).

Solvent extraction does not appear in the statutory provision nor is it defined in respondent's regulations.[22] It may be defined broadly as a separation process in which two or more immiscible fluids are brought into contact for the transfer or separation of one or more components from one liquid to the other. Webster's Third International Dictionary (1965); EPA, Solvent Extraction Status Report 9 (Dec. 1972). This separation requires that the constituents have different relative solubilities.

Petitioner emphasizes that solvent extraction represents merely a substitute for the multiple precipitation process, which it had previously used in respect of vanadium and tungsten, and that such substitutionary quality satisfies the statutory requirement of substantial equivalence. We are not prepared to accord such a broad sweep to the meaning of "substantially equivalent." Conceivably, there may be situations where the substituted process (not specified in sec. 613(c)(4)(D)) may be so radically different in its purpose and function and the results produced (see *Barton Mines Corp. v. Commissioner, supra*) that it would be akin to a manufacturing process and, therefore, should be classified as nonmining.

Petitioner's comparison of the two processes in terms of similarities is more to the point: "Both processes are chemical processes involving the use of chemicals. Both processes involve the introduction of reagents. Both processes are applied to a liquid solution rather than to an ore. Both processes remove impurities. Both processes serve a concentrating function."[23]

---

to address the "concentration" process question—a path which would require us to examine the validity of respondent's regulation. We note, however, that "leaching" involves a similar change from a solid to liquid state but nevertheless is a specified mining process under sec. 613(c)(4)(D).

[22]Nor is the term defined or otherwise mentioned in Rev. Proc. 78–19, 1978–2 C.B. 491, which contains definitions of certain mining terms used by respondent in applying sec. 613(c)(4) and (5).

[23]But see note 21 *supra*.

Respondent takes the general position that, in order for a process to be considered substantially equivalent to a specified process, the process in question must be physically, mechanically, and chemically substantially similar to the specified process, and the use of the process in question must be found to produce a substantially equivalent enhancement or beneficiation of the ore or mineral as compared with that produced by the commercial application of a specifically named process to similar ore or material.[24] Respondent fleshes out his general argument with three specific assertions in respect of dissimilarities between solvent extraction and precipitation:

(1) unlike any of the named process [sic], solvent extraction acts upon a liquid and produces a liquid[;] (2) unlike any of the named processes as commercially applied, solvent extraction involves the use of organic compounds and organic chemical reactions; and (3) in the case of tungsten and vanadium, the products produced using solvent extraction are not substantially equivalent to the products of processing that does not involve solvent extraction.

The essence of respondent's argument is that solvent extraction constitutes a "refining" process precluded from being considered as a mining process by virtue of section 613(c)(5).

As far as respondent's general proposition is concerned, we think it runs contrary to the thrust of *Barton Mines Corp. v. Commissioner, supra.* Granted that the Second Circuit Court of Appeals did not deal directly with the issue of substantial equivalence, it did adopt an overall view of purpose, function, and result in determining the scope of the word "concentration" (a specified mining process under sec. 613(c)(4)(D)) (see 446 F.2d at 989), an approach also adopted by this Court (see 53 T.C. at 254, 258). Respondent's general position would produce a significantly stricter standard for decision.

With respect to the specifics of respondent's general assertion, we find them equally unpersuasive. The fact that solvent extraction acts upon a liquid to produce a liquid seems to us a

---

[24]Respondent here cites Hearings on Mineral Treatment Processes for Percentage Depletion Purposes Before the Comm. on Ways and Means, 86th Cong., 1st Sess. 50 (1959). In those hearings, there is testimony that the legislation is directed generally to provide "that those processes necessary to separate waste materials from the mineral would be allowed as a mining process, and those processes which would produce a chemical change would normally be treated as a manufacturing process." The exception to this principle noted in the hearings was that the statute named certain processes to be mining processes even though they would, under the general formula, be treated as nonmining processes.

distinction without a difference in the application of the purpose, function, and results test. Similarly, we are unimpressed by the argument that solvent extraction is chemically different from any of the named processes since they all involve inorganic chemistry, and solvent extraction is an organic process. We find nothing in the legislative history of the Gore amendment which indicates that Congress selected the processes specified based upon the presence of a carbon atom (in solvent extraction, kerosene contains a carbon atom and thus the use of kerosene makes the process an organic one). See *Dow Chemical Co. v. Commissioner*, 51 T.C. 669, 681 (1969), affd. 433 F.2d 283 (6th Cir. 1970). See also the discussion in respect of the element of chemical change, pages 245-247 *infra*.

Finally, we are not persuaded that the nature and quality of the end product of the solvent extraction process are such as to preclude a holding that such process is substantially equivalent to precipitation. We recognize that the end product of solvent extraction was a more desirable commercial product than would have resulted from multiple precipitations (which respondent acknowledges petitioner could have used), but that fact is not in and of itself sufficient to exclude the application of the test of substantial equivalence.[25] Cf. *Barton Mines Corp. v. Commissioner*, 446 F.2d at 989. See also 53 T.C. at 254.

Petitioner also argues that solvent extraction is necessary to the preceding function of leaching and to the subsequent

---

[25] The following is a comparison of the end products before and after the use of the solvent extraction circuits:

(a) Rifle and Hot Springs Plants

*Presolvent extraction:* produced sodium hexavanadate (red cake) by the use of leaching precipitation process. Red cake contains 83- to 86-percent equivalent $V_2O_5$ (AMV could be produced by dissolving the red cake product in ammonia and adding ammonium chloride to cause the formation of a solid AMV out of the liquid.)

*Solvent extraction:* ammonium metavanadate (AMV) which contains 77-percent equivalent $V_2O_5$. AMV is a more desirable end product since subsequent processing can be used to easily remove the ammonium by heating the AMV to produce fused oxides of vanadium.

(b) Bishop Plant

*Presolvent extraction:* processed tungsten ores to produce synthetic scheelite, containing approximately 71-percent equivalent $WO_3$ (synthetic scheelite contains calcium which is not as easily removed as is ammonium in APT.)

*Solvent extraction:* ammonium paratungstate (APT) containing 89.3-percent equivalent $WO_3$. This method was developed by the Bureau of Mines specifically to recover tungsten as APT without producing synthetic scheelite as an intermediate product. See P. Churchward & D. Bridges, Tungsten Recovery from Low Grade Concentrates by Amine Solvent Extraction 1 (Bureau of Mines 1966).

functions of precipitation (vanadium) or crystallization (tungsten). Respondent's main counter to this argument is that since petitioner could have used a specified mining process, i.e., precipitation, in lieu of solvent extraction, we are required to conclude that solvent extraction was not necessary to any specified mining process and, therefore, does not fall within the exception to section 613(c)(5).[26]

Under the test in *Barton Mines*, adopted by the Second Circuit Court of Appeals, a process must be demonstrated to be essential or indispensable to the performance of the mining operation before it may be classified as necessary—"it must be shown that the [mining function] could not occur except for the disputed process, which itself was an integral part of the operation." (446 F.2d at 991.)

We think that respondent reads this test too restrictively. Just as we have indicated that the mere fact of substitution is an insufficient basis for holding that the process is substantially equivalent to the process being replaced (see p. 240 *supra*), so we do not think that the mere availability of a specified mining process to take the place of solvent extraction is enough to disqualify the latter as "necessary" within the meaning of the exception clause to section 613(c)(5). Nor do we believe that the Second Circuit Court of Appeals intended any such simplistic interpretation of its test. Rather, we think the focus should be upon whether, absent the process in question (in this case solvent extraction), the mining process could have been completed by the use of the preceding processes and/or by the subsequent processes involved. On this basis, we think it is clear that solvent extraction was an essential and indispensable ingredient and an "integral part of the operation," from leaching through precipitation (in the case of vanadium) and through crystallization (in the case of tungsten) within the meaning of the exception clause to section 613(c)(5).[27] Cf. *Dow Chemical Co. v. Commissioner*, 433 F.2d at 288. See also *Ranchers Exploration & Development Corp.*

---

[26]See note 18 *supra*.

[27]In view of our holding, we see no need to delve into the meaning of the word "incidental" in that exception clause—an issue to which this Court and the Court of Appeals gave considerable attention in *Barton Mines*— and the question of relative insubstantiality of cost under respondent's regulations. See 446 F.2d 994; sec. 1.613–4(f)(2)(iii), Income Tax Regs.

*v. United States,* an unreported opinion (D. N.M. 1978, 42 AFTR 2d 78–5561, 78–2 USTC par. 9556).

Our analysis of "substantially equivalent" within the meaning of section 613(c)(4)(D) and "necessary" under the exception clause to section 613(c)(5) would not be complete without reference to some of the other considerations urged by respondent and it is to these considerations that we now turn our attention.

First, respondent argues that it is a prerequisite to the existence of a mining process that it apply a process "used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit." See note 17 *supra.* Admitting that the statute is ambiguous with respect to whether this limitation applies to the specific processes named in that section or only to "substantially equivalent" processes, respondent contends that, at least as to the latter category, the regulations make clear that such processes will be recognized "*only to the extent* that they are applied to the taxpayer's ore or mineral" for such purpose. See sec. 1.613–4(f)(4), Income Tax Regs., note 17 *supra.* (Emphasis added.) Respondent points out that the prinicipal consequence of solvent extraction is to separate contaminants which were not found in the vanadium or tungsten ore as it came from the mine, and not to separate impurities contained in such ore as found in the ground. Based upon the foregoing, respondent concludes that solvent extraction is not a mining process.

Clearly by its terms, the regulation in question does not apply to processes which are "necessary" to the processes specified as mining. Since we have found that solvent extraction falls within this category, the regulation does not apply. Cf. *Barton Mines Corp. v. Commissioner, supra.* Beyond this, we note that solvent extraction in fact removed impurities in the vanadium and tungsten ore (see findings of fact, pp. 224, 231 *supra*)—albeit they were quantitatively small in relation to the contaminants introduced during the preceding processes. As has been pointed out: "No reported case has ever denied mining status to an extractive process designed to remove the valuable mineral from the worthless gangue." See *Barton Mines Corp. v. Commissioner,* 446 F.2d at 995. Under these circumstances, although we do not decide the issue, we think that it is at least open to question, whether respondent's regulation comports with the statutory

provision (sec. 613(c)(4)(D)) which does not contain the "only to the extent" language. See and compare *Barton Mines Corp. v. Commissioner*, 446 F.2d at 989. In this connection, we note that the language in *Barton Mines Corp. v. Commissioner, supra,* where the Court of Appeals dealt with the dryer "H" process and seemingly rejected any process which removed contaminants was directed to a situation where *only* such removal was involved. See 446 F.2d at 993.

Closely allied to the foregoing argument by respondent is his contention that "substantially equivalent" involves an analysis of the degree of beneficiation accomplished and that such an analysis herein requires the conclusion that solvent extraction was effectively a "refining" process within the meaning of section 613(c)(5). As we see the situation, respondent overplays his hand. Section 613(c)(4)(D) simply speaks of beneficiation in terms of the specified processes and contains no indication that the degree of beneficiation should be considered. It is clear that many mining processes involve beneficiation. As our findings of fact show (see pp. 227–230 *supra*), the pattern of beneficiation is contradictory insofar as petitioner's solvent extraction process is concerned. With respect to vanadium, the product (AMV), as it merged from solvent extraction, contained 77-percent equivalent $V_2O_5$ as compared with 83 to 86 percent. With respect to the tungsten product (APT), the comparable figures are 89-percent and 70-percent equivalent $WO_3$. Granted that some processes may involve such a degree of beneficiation that they should constitute "refining," we are satisfied that such is not the case herein. See and compare the percentage changes involved in *Barton Mines Corp. v. Commissioner*, 446 F.2d at 991. In this connection, we note that respondent's regulations state that "In general, a refining process is designed to achieve a *high degree of purity* by removing relatively small amounts of impurities or foreign matter from smelted or partially processed ores or minerals." See sec. 1.613–4(g)(6)(iii), Income Tax Regs. (Emphasis added.) Thus, even though only small amounts of impurities contained in the natural ore or mineral were removed by the solvent extraction process (see findings of fact, p. 229 & note 11 *supra*), the crucial fact is that further processing was required in order to obtain a "high degree of purity."

As a further argument, respondent lays great stress on the fact that solvent extraction involves chemical change (which

fact petitioner does not dispute) and that, consequently, it falls within the "treatment effecting a chemical change" category of a nonmining process under section 613(c)(5). We think that there are several reasons for rejecting respondent's contention. In the first place, as respondent recognizes, section 613(c)(5) is modified by the clause excepting processes which qualify under section 613(c)(4)(D) and those "necessary or incidental" to such qualifying processes. Our conclusions that solvent extraction is substantially equivalent to precipitation and also is necessary to other mining processes involved in the extraction of vanadium and tungsten are, therefore, sufficient to preclude the applicability of section 613(c)(5). Secondly, certain of the processes specified in section 613(c)(4)(D) involved chemical change.[28] *Ranchers Exploration & Development Corp. v. United States, supra* note 21. See also *Dow Chemical Co. v. Commissioner, supra.*[29] Moreover, we note that respondent has included, in his regulation, provisions defining the term "treatment effecting a chemical change" and dealing with transformation processes which impart a much more flexible rule for determining the extent of chemical change.[30] These provisions clearly modify the blanket

---

[28] A chemical change involves any alteration of the chemical identity of the material. Bureau of Mines, A Dictionary of Mining, Mineral and Related Terms 199 (1968). The following is a comparison of processes named in the statute:

| Process | Chemical change involved |
|---|---|
| Crushing | None |
| Grinding | None |
| Beneficiation by concentration | None |
| Gravity | None |
| Flotation | Involves application of chemical. No chemical change. |
| Amalgamation | Involves application of chemical. |
| Electrostatic-magnetic operations | None |
| Cyanidation | Involves application of chemical. Produces chemical change. |
| Leaching | Involves application of chemical. Produces chemical change (i.e., acid leaching). |
| Crystallization | None |
| Precipitation | Involves application of chemical. Produces chemical change. |

[29] Although this case was decided under the earlier "marketable product" standard, it is noteworthy because the Sixth Circuit and the Tax Court held that the occurrence of a chemical change during a process is not determinative of a nonmining function where the mineral is a sec. 613(c)(4)(D) mineral not customarily sold in crude form.

[30] Sec. 1.613–4(g)(5) and 6(vii), Income Tax Regs., provides:

(5) *Transformation processes.* Processes which effect a *substantial* physical or *chemical change in a crude mineral product*, or which transform a crude mineral product into new or

provision of section 613(c)(5), and the regulation thereunder, which repeats the statutory language but is cross-referenced to these definitions. See notes 18 & 30 *supra*. We are satisfied that the molecular change which occurred during the solvent extraction process as applied to vanadium and tungsten (see note 21 *supra*) is not the type of change of "chemical composition" which is the focus of respondent's regulation; clearly, it is not comparable to the coking of coal example contained in that regulation. Cf. *Dow Chemical Co. v. Commissioner, supra.*

Finally, we think it significant that, since 1961, respondent has recognized that solvent extraction constitutes a mining process in respect of uranium which was specifically added, by the Gore amendment, to the list of minerals to which allowable mining processes would be applicable under section 613(c)(4)(D). See H. Rept. 2005, 86th Cong., 2d Sess. 10 (1960); Letter to Senate from Stanley S. Surrey, Assistant Secretary of the Treasury (Sept. 19, 1961), 107 Cong. Rec. 20192–20193 (1961). To this day, respondent has not altered his position.[31] While we recognize that there may be some differences between the use of solvent extraction in respect of uranium and its use in respect of vanadium and tungsten (as respondent suggests on brief but does not articulate in terms of any specificity), we are satisfied from the record before us that, insofar as the elements of decision herein are concerned, the essential character of solvent extraction was the same in respect of all three minerals. We recognize that administrative practice does not operate to estop respondent from changing his position. See *Automobile Club v. Commissioner*, 353 U.S. 180 (1957); see also *Davis v. Commissioner*, 69 T.C. 716 (1978); but courts have often taken into account administra-

---

different mineral products, or into refined or manufactured products, are nonmining processes except to the extent that such processes are specifically allowed as mining processes in section 613(c) or under paragraph (f) of this section.

(6) *Definitions.* As used in section 613(c)(5) and this section—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(vii) The term "treatment effecting a chemical change" refers to processes which *transform or modify the chemical composition* of a crude mineral, as, for example, the coking of coal. The term does not include the use of chemicals to clean the surface of mineral particles provided that such cleaning does not make any change in the physical or chemical structure of the mineral particles.

[Emphasis added.]

[31]The record reveals that respondent has allowed the petitioner herein to treat solvent extraction as a mining process in connection with its treatment of uranium at the Rifle plant.

tive interpretations as an aid to statutory construction. *Fribourg Nav. Co. v. Commissioner*, 383 U.S. 272 (1966); *Hanover Bank v. Commissioner*, 369 U.S. 672, 685 (1962).

In sum, we think that solvent extraction—a less costly and more efficient process than multiple precipitations—represents simply an improvement in the mining art which Congress had in mind when it enacted the Gore amendment in 1960. See p. 238 *supra*. We do not perceive it as a process which looked to the market,[32] rather than a constituent part of the mining process directed toward the removal of impurities in vanadium and tungsten in its crude form—a form in which it was not customarily sold. Clearly, we do not have before us a situation where a taxpayer merely rearranged the sequence of its processes so as to inject a later process, which was clearly manufacturing of the finished product, into the mining processes in an attempt to conceal or distort its true character—a situation which would call for a different analysis and probable conclusion. The long and the short of the matter is that we conclude that solvent extraction is "substantially equivalent" to precipitation within the meaning of section 613(c)(4)(D) and also that it is "necessary" to other mining processes within the meaning of the exception clause of section 613(c)(5). Consequently, it is a mining process with respect to which depletion is allowable under section 613. We reach our conclusion through a synthesizing of the statute and respondent's regulations in a manner which makes it unnecessary for us to invalidate any of those regulations.[33]

These conclusions make it unnecessary for us to consider respondent's argument that we should deny mining process status to those processes applied subsequent to solvent extrac-

---

[32] In this context, we note that, in one place, the Court of Appeals in *Barton Mines* speaks of "processes * * * more properly viewed as designed to facilitate market acceptance and not the removal of impurities." See 446 F.2d at 993. In another place, it speaks of functions which "looked *solely* toward the market and were neither essential to nor designed to facilitate the removal of impurities." (See 446 F.2d at 994; emphasis added.)

[33] See note 21 *supra*, dealing with the concentration process. We are also constrained to note that solvent extraction seems to involve elements which are reflected in part in leaching and concentration as well as precipitation. On this basis, it is possible that it would fall within the phrase "combination of processes" contained in sec. 613(c)(4)(D). Neither party has presented any arguments on this score, and, accordingly, we decline to deal with the issue.

tion because of section 1.613–4(g)(2), Income Tax Regs. (sometimes referred to as the "cut off" or "sudden death" rule).[34] We note, however, that this Court has previously refused to apply the cut-off or sudden death rule and that this treatment has been affirmed by the Second Circuit.[35] *Barton Mines Corp. v. Commissioner*, 53 T.C. at 258, 446 F.2d at 990. The particular sequence in which processes are applied is not the significant criteria; it is the function of the process and the extent of its relationship to the mining function which are important.

We are still left with the question of whether the processes applied by petitioner subsequent to solvent extraction should in any event be considered as "mining."

At the Rifle plant, the challenged processes are the precipitation of vanadium (by adjusting the pH of the liquor, adding a reagent, cooling, and filtering) and drying. At the Hot Springs and Bishop plants, in lieu of precipitation, a crystallization step is used (by heating the product liquor with steam and filtering).

Precipitation and crystallization are both processes named in section 613(c)(4)(D). We, therefore, conclude that they are clearly mining.

This brings us to the question of the drying process. In *Barton Mines*, the dryer H, which served to remove water accumulated in prior concentration processes, was found to be "directly associated with mining, through long mining practice." It was held that the drying process was made necessary by the other mining processes. 53 T.C. at 254, 446 F.2d at 991–994. This is in accord with respondent's own regulations which classify a dripping process, such as used herein, as mining. See sec. 1.613–4(f)(5)(iii), Income Tax Regs. Accordingly, we find petitioner's

[34]Sec. 1.613–4(g)(2), Income Tax Regs., provides in pertinent part as follows:

(2) *Processes subsequent to nonmining processes. Notwithstanding any other provision of this section, a process applied subsequent to a nonmining process (other than nonmining transportation) shall also be considered to be a nonmining process.* Exceptions to this rule shall be made, however, in those instances in which the rule would discriminate between similarly situated producers of the same mineral. * * * [Emphasis added.]

We note that, in the case of tungsten, the parties have stipulated that step f (see findings of fact, p. 231 *supra*) is a nonmining process. Respondent has not argued that this should bring the cut-off or sudden death rule into play, irrespective of our conclusions in respect of solvent extraction.

[35]We note that a cut-off rule or sudden death provision was specifically deleted from the Gore amendment before its final passage. Compare sec. 302(b)(4)(B), Public Debt and Tax Role Extension Act of 1960, Pub. L. 86–564, 74 Stat. 290, with H. Rept. 2005 (Pub. L. 86–564), 86th Cong., 2d Sess. 8 (1960); see 106 Cong. Rec. 13216–13217 (1960).

drying process was a continuation of the extraction process and was, therefore, mining.

FINDINGS OF FACT

## Issue 2. Foreign Tax Credit

All of the facts as to this issue have been stipulated by the parties, including the taxable income (or loss) of petitioner and each of its affiliated corporations.

Petitioner included 34 subsidiaries in its consolidated Federal corporate income tax return for the taxable year ending December 31, 1971. Two of the subsidiaries, Ucar Interam, Inc., and Union Carbide Inter-America, Inc., qualified as section 921 Western Hemisphere Trade Corporations (hereinafter WHTCs). Although many of the affiliated corporations sustained net taxable losses in 1971, both WHTCs had gross income in excess of deductions for that year.

In computing its section 922 foreign tax credit, petitioner elected the overall limitation provided by section 904(a)(2) (now sec. 904(a)) and applied the further limitation imposed by section 1503(b)(1) upon all affiliated groups containing one or more WHTCs. Rather than computing the latter limitation according to the dictates of section 1.1502–25(c), Income Tax Regs., petitioner followed the procedure specified in a technical advice memorandum issued by the respondent to the petitioner in connection with the taxable years 1967 through 1970.

Respondent, in an amendment to his answer in this proceeding based upon *Mid-Continent Supply Co. v. Commissioner*, 571 F.2d 1371 (5th Cir. 1978), affg. 67 T.C. 37 (1976) (see pp. 256–257 *infra*), determined a deficiency representing the difference between the foreign tax credit as computed by petitioner and as computed pursuant to section 1.1502–25(c), Income Tax Regs.[36]

---

[36]Sec. 1503 limits the sec. 901 foreign tax credit available to affiliated corporations filing a consolidated tax return, if one or more of the corporations is a WHTC, by reducing the amount of tax that may be taken into account under sec. 901. That reduction is equal to—

(b)  * * *

(A) the amount [by which] such taxes (or, if smaller, the amount of the tax which would be computed under subsection (a), if such corporations were not Western Hemisphere trade corporations, with respect to the portion of the consolidated taxable income attributable to such corporations), exceeds

(B) the amount of the tax computed under subsection (a) with respect to the portion of the consolidated taxable income attributable to such corporations.

Subsequently, the Court of Claims upheld petitioner's method of computation for the taxable year 1967 and invalidated the inconsistent portion of section 1.1502–25(c), Income Tax Regs. *Union Carbide Corp. v. United States*, 222 Ct. Cl. ___ , 612 F.2d 558 (1979).[37] The United States did not file a petition for certiorari to review that decision. Petitioner amended its reply to assert the defense of collateral estoppel.

### OPINION

### *Issue 2. Foreign Tax Credit*

The threshold question before this Court is whether the Court of Claims decision in *Union Carbide Corp. v. United States*, 222 Ct. Cl. ___ , 612 F.2d 558 (1979) (hereinafter *Union Carbide*), precludes examination of the propriety of petitioner's method of computation under section 1503. *Union Carbide* sustained a challenge to the validity of section 1.1502–25(c), Income Tax Regs., by the petitioner in this case, but with respect to an earlier tax year. In dealing with this question, we enter the world of light and shadows in which the doctrines of res judicata and collateral estoppel have long existed. Our task is made somewhat easier by the recent opinions of the Supreme Court in

---

The dispute centers on the proper method for computing "the portion of the consolidated taxable income attributable to" the WHTC corporations. Petitioners computed that amount by dividing the net sum of the taxable income of the WHTCs by the net taxable income of the affiliated group and then multiplying that fraction times the total taxes owed (before computing the sec. 901 deduction) by the affiliated group.

Respondent follows the same method with the single exception of excluding from both the numerator and denominator all corporations having net tax losses. If all corporations have net taxable income, the two methods yield precisely the same results. If, as here, net losses are realized by some of the non-WHTCs, then the effect of the respondent's method is to attribute less taxable income to the WHTCs than does petitioner, thereby reducing the foreign tax credit available. If the distribution of taxable income and loss were different among the affiliated corporations, the respondent's method could actually benefit the taxpayer. See *Mid-Continent Supply Co. v. Commissioner*, 67 T.C. 37, 43 n. 10 (1976), affd. 571 F.2d 1371 (5th Cir. 1978).

[37]The timing of the various cases relevant to this proceeding is as follows:

| | |
|---|---|
| Petition in this case filed | Apr. 29, 1976 |
| Answer by respondent | June 11, 1976 |
| *Mid-Continent Supply* decided | Oct. 18, 1976 |
| Petition in *Union Carbide* filed | Apr. 26, 1978 |
| *Mid-Continent Supply* affd. | Apr. 28, 1978 |
| Respondent amends answer in this case to include foreign tax credit issue | May 5, 1978 |
| Tax Court trial | Aug. 15-16, 1978 |
| Tax Court original briefs filed | Nov. 21, 1978 |
| Tax Court reply briefs filed | Feb. 26, 1979 |
| *Union Carbide* decided | Dec. 12, 1979 |
| Amended reply | Mar. 14, 1980 |

*Montana v. United States,* 440 U.S. 147 (1979), and *Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979), both of which substantially expanded the area in which collateral estoppel should be applied. While the precise limits of that expansion will undoubtedly require further judicial analysis, it is clear that both cases, particularly *Montana v. United States, supra,* throw more light than shadow on the problem with which we are confronted herein.

At the outset, we note that there is no question that both doctrines can be applied against the Government in Federal tax cases. *Tait v. Western Md. Ry. Co.,* 289 U.S. 620, 623–624 (1933). See also *Commissioner v. Sunnen,* 333 U.S. 591, 598 (1948). Similarly, respondent does not (nor could he) argue that a distinction should be made on the ground of lack of mutuality based upon the fact that the United States was the defendant in *Union Carbide* in the Court of Claims and the Commissioner of Internal Revenue is the respondent herein. Sec. 7422(c); *Tait v. Western Md. Ry. Co., supra* at 627; *Lea, Inc. v. Commissioner,* 69 T.C. 762, 764 (1978). We also note that the question of timing due to the pendency of the two cases in the Court of Claims and in this Court is not a significant factor. *Chicago, R.I. & P. Ry. v. Schwendel,* 270 U.S. 611, 616–617 (1926); *Williams v. Ward,* 556 F.2d 1143, 1154 (2d Cir. 1977).

The judicial application of the doctrines of res judicata and collateral estoppel over the years has not been without its murky aspects. No doubt this has been due to the fact that "The doctrine of collateral estoppel is an adjunct of, and in some instances is loosely referred to as, res judicata." See *Fairmont Aluminum Co. v. Commissioner,* 22 T.C. 1377, 1380 (1954), affd. 222 F.2d 622 (4th Cir. 1955),[38] where we carefully delineated the differences between the two doctrines. See also *Commissioner v. Sunnen, supra* at 598.

It is well settled that each tax year involves a distinct cause of action, and so a determination of a taxpayer's tax liability is only res judicata as to the tax year actually litigated. *Fairmont Aluminum Co. v. Commissioner, supra.* Accordingly, the question before us is whether *Union Carbide* is binding upon the respondent because of collateral estoppel. Admittedly, collateral

---

[38]See *Tait v. Western Md. Ry. Co.,* 289 U.S. 620 (1933), wherein the Supreme Court opinion seems to use both phrases interchangeably.

estoppel is not applied with the same severity as res judicata. *Commissioner v. Sunnen, supra; Segal v. American Telephone & Telegraph Co.*, 606 F.2d 842 (9th Cir. 1979); *Tait v. Commissioner*, 78 F.2d 193 (3d Cir. 1935); Note, "Collateral Estoppel as to Questions of Law in Federal Tax Cases," 35 Iowa L. Rev. 700 (1950). But, as the Supreme Court has recently stated in *Montana v. United States*, 440 U.S. at 153–154, the basic objectives are the same, namely—

To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

The Court went on to delineate the contours of that doctrine. "The appropriate application of collateral estoppel," the Court stated, turns on the answers to three questions:

first, whether the issues presented by this litigation are in substance the same as those resolved against the United States in [the prior suit]; second, whether controlling facts or legal principles have changed significantly since the [prior] judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion. [440 U.S. at 155.]

The issue involved herein is the same as that resolved in *Union Carbide*. Petitioner's method of computing the section 1503 limitation on its foreign tax credit has not changed since *Union Carbide*, nor has the regulation which prescribes a different method. The only changed circumstances are the dollar amount in controversy and the tax year in question, neither of which precludes the application of collateral estoppel. *Montana v. United States, supra; Tait v. Western Md. Ry. Co., supra; Lea, Inc. v. Commissioner, supra.*

No relevant aspect of tax law has changed since *Union Carbide*, nor has the legal climate undergone sufficient modification to suggest that reexamination of section 1.1502–25(c), Income Tax Regs., is in order. See *Commissioner v. Sunnen, supra* at 600. Cf. *United States v. Russell Manufacturing Co.*, 349 F.2d 13 (2d Cir. 1965).[39]

Thus, the issue this Court must determine is whether any

---

[39]Although, in *United States v. Russell Manufacturing Co.*, 349 F.2d 13 (2d Cir. 1965), the Court of Appeals in fact affirmed a decision of the District Court which was grounded on stare decisis, the thrust of its opinion seems clearly to reflect the application of collateral estoppel.

special circumstances in this case "warrant an exception to the normal rules of preclusion." The most difficult question is whether the legal determination that a regulation is invalid may give rise to an estoppel. The difficulty arises because the Supreme Court has suggested that collateral estoppel does not apply to situations where the prior decision involved a pure question of law. In fact, respondent argues herein that collateral estoppel is per se inapplicable to such situations. We disagree.

In *United States v. Moser*, 266 U.S. 236 (1924), the Supreme Court applied collateral estoppel based on a decision that certain conduct constituted active service during the Civil War, thereby entitling Moser to a war pension. Moser's successful first suit in the Court of Claims established his right to the annual pension; two subsequent suits reestablished his right to the pension payments for later years. Between Moser's first and second suits, however, the Court of Claims held in an unrelated case that its *Moser* decision had been erroneous. Nonetheless, that court allowed Moser (but not others, see *Jasper v. United States*, 43 Ct. Cl. 368 (1908)) the continuing benefit of this initial victory because of collateral estoppel. The Supreme Court affirmed, holding that "a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." *United States v. Moser*, 266 U.S. at 242; see *Lea, Inc. v. Commissioner*, 69 T.C. at 766–767.

The Supreme Court in *Moser* drew a distinction between a "fact, question or right" and an "unmixed [question] of law," saying that, as to the latter, "the parties in a subsequent action upon a different demand [cause of action] are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases." 266 U.S. at 242. The distinction between a "right" and an "unmixed [question] of law" has remained elusive. In *Commissioner v. Sunnen*, 333 U.S. at 601–602, the Court recast this distinction in terms of the facts underlying the legal question: collateral estoppel will apply if the "very same" facts are involved, but not if they are "separable," even if "similar or identical." Compare Restatement, Judgments, sec. 70 (1942) (prior litigation of an issue of law "does not necessarily preclude" subsequent litigation of such issue "between the parties based upon a different cause of

action"); Restatement, Judgments 2d, sec. 68.1(a) (Tent. Draft No. 4, 1977) (collateral estoppel does not apply where "The issue is one of law" *and* the claims "are substantially unrelated"); A. Scott, "Collateral Estoppel by Judgment," 56 Harv. L. Rev. 1, 10 (1942) (collateral estoppel does not apply to questions of law in "successive actions involving unrelated subject matter").

The Supreme Court's distinction has been criticized as overly thin (e.g., *Hadge v. Second Federal Savings & Loan Assn. of Boston*, 409 F.2d 1254, 1257 (1st Cir. 1969); E. Griswold, "Res Judicata in Federal Tax Cases," 46 Yale L. J. 1320 (1937)), and has produced a myriad of inconsistent lower court opinions.[40] The most that can be said is that the collateral estoppel effect of a determination of an "unmixed [question] of law" must be decided on a case-by-case basis; in each instance, a balance must be struck between desirable finality and the extreme rigidity of a per se application of a question of law exception. *Montana v. United States*, 440 U.S. at 162–163; see *Segal v. American Telephone & Telegraph Co., supra.*

Moreover, the analysis of the impact of a change in the legal climate by the Supreme Court in *Commissioner v. Sunnen, supra*, clearly implies that the existence of a pure question of law does not, per se, preclude the application of collateral estoppel. Furthermore, *Montana v. United States* involved a pure question of law, to wit, the immunity of the United States from State taxation.[41] In referring to the possible exception with respect to issues of law, the Supreme Court specifically referred to "successive actions *involving unrelated subject matter*" in stating the circumstances where the application of the doctrine of collateral estoppel "*may* be inappropriate." (See 440 U.S. at 162; emphasis added.) See also Restatement, Judgments 2d, *supra*.[42] Clearly, that is not the case herein, for, as we have previously pointed out (see p. 253 *supra*), except for the amounts of income or loss, the same underlying facts and legal issues

---

[40]Compare, e.g., *Lyons v. Westinghouse Electric Corp.*, 222 F.2d 184, 188 & n. 2 (2d Cir. 1955) (Hand, *J.*), with *Irving Nat. Bank v. Law*, 10 F.2d 721, 724 (2d Cir. 1926) (Hand, *J.*); compare *Tait v. Commissioner*, 78 F.2d 193 (3d Cir. 1935), with *International Bldg. Co. v. United States*, 199 F.2d 12 (8th Cir. 1952), revd. on other grounds 345 U.S. 502 (1953).

[41]The Supreme Court summarily dismissed the Government's attempt to establish a factual distinction. See *Montana v. United States*, 440 U.S. 147, 158–161 (1979).

[42]Even the presently effective version of Restatement, Judgments, sec. 70 (1942), specifies that relitigation of a question of law will not "necessarily" be precluded. See pp. 254–255 *supra*.

were before the Court of Claims in *Union Carbide*. Thus, the legal demands and subject matter are "closely aligned." See *Montana v. United States*, 440 U.S. at 162–163. The phrases "unrelated subject matter" and " 'closely aligned' in time and subject matter" assume particular significance when one takes into account that the interpretation of separate contracts was involved in *Montana*.

Respondent's second argument is that, even if collateral estoppel applies to questions of law, such application is subject to the limitation that injustice should not result. His argument under this rubric also involves contentions relating to the use of judicial resources and the alleged implications of our prior decision in *Mid-Continent Supply Co. v. Commissioner, supra.*

Respondent points out that the briefs on the foreign tax credit issue involved herein were submitted to this Court before the decision in *Union Carbide*. See note 37 *supra*. Concededly, such fact would indicate that the resources of the parties' counsel would not have to be tapped further in order to enable us to decide the substantive foreign tax credit issue. However, one has only to peruse the Court of Claims opinion in *Union Carbide* to appreciate the highly technical and complex issue involved. Thus, the potential drain on judicial resources, an important consideration in applying collateral estoppel (see *Montana v. United States*, 440 U.S. at 153; *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)), remains. In any event, the courts have not hesitated to apply collateral estoppel despite a full trial, briefing, and argument involving the merits of the controversy. *Bennett v. Commissioner*, 113 F.2d 837 (5th Cir. 1940), revg. on procedural grounds 40 B.T.A. 745 (1939); *Armstrong v. United States*, 173 Ct. Cl. 944, 354 F.2d 274 (1965); *C.B.C. Super Markets, Inc. v. Commissioner*, 54 T.C. 882 (1970).

Respondent also points to our decision in *Mid-Continent Supply Co. v. Commissioner, supra,* and argues that we should not, through the application of collateral estoppel herein, put ourselves in the position of having reached inconsistent results on the same issue. The fact of the matter is that the validity of respondent's regulation under section 1502 (see also sec. 1.1503–1, Income Tax Regs.) was not challenged in *Mid-Continent* as it was in *Union Carbide* and is herein.

In *Mid-Continent*, the taxpayer did not question the validity of respondent's regulations (secs. 1.1502–25(c) and 1.1503–1,

Income Tax Regs.) insofar as they applied to computing that portion of an affiliated group's taxable income attributable to its WHTCs in calculating its section 922 deduction. We simply held that the computation for section 1503(b)(2) must mirror that for section 922. 67 T.C. at 46; see *Union Carbide Corp. v. United States*, 612 F.2d at 565. Here, however, the petitioner challenges the regulation as applied to *both* sections 922 and 1503(b)(1), and so does not (as the taxpayer sought to do in *Mid-Continent*) "disregard the relationship that the consolidated section 922 deduction bears to the section 1503(b)(1) limitation," which would, as a consequence, "rob section 1503(b)(1) of its validity and purpose." 67 T.C. at 46. Thus, *Mid-Continent* is clearly distinguishable and offers respondent no solace. Moreover, we note that inconsistent decisions by the same court not only do not preclude the application of collateral estoppel but can be the natural consequence of such application. E.g., *United States v. Moser, supra.*

The main thrust of respondent's "injustice" argument centers upon the importance of giving respondent another hack at the tree in order to have the opportunity to obtain a contrary decision either from this Court or from the Court of Appeals (if we were to decide the substantive issue adversely for respondent), thus enhancing the chances for review by the Supreme Court, in order to minimize the potential diversity of treatment of taxpayers of the same class. We are not unaware of the importance of uniformity of treatment of taxpayers. This element was emphasized in *Commissioner v. Sunnen*, 333 U.S. at 599; and *Montana v. United States*, 440 U.S. at 161–162, specifically referred to such emphasis and pointed out that no such considerations were involved in that case. See and compare also *Divine v. Commissioner*, 500 F.2d 1041, 1045–1050 (2d Cir. 1974), affg., revg., and remanding 59 T.C. 152 (1972), with *United States v. Russell Manufacturing Co.*, 349 F.2d at 18–19. We think it important to note, however, that the Supreme Court's comments regarding uniformity of treatment of taxpayers was made in the context of not creating "vested rights in decisions that have become obsolete or erroneous in time" because of a change in controlling legal principles. See *Commissioner v. Sunnen*, 333 U.S. at 599; *Montana v. United States*, 440 U.S. at 158–162. No such change has occurred herein, and one can hardly say that *Union Carbide* has become "obsolete with

time." What is more, there are occasions where inconsistent decisions create discriminatory treatment and strain the credibility and rationality of our Federal tax system. See Note, "Collateral Estoppel: Loosening the Mutuality Rule in Tax Litigation," 73 Mich. L. Rev. 604, 619 (1975).

Moreover, it seems to us that respondent is on the horns of a dilemma. If we or the Court of Appeals should decide the substantive foreign tax credit issue in his favor, the result would be an inconsistency in decisions—a result that collateral estoppel was designed to prevent. See *Montana v. United States*, 440 U.S. at 154. On the other hand, if respondent should lose on the substantive issue, he will have made his road harder if and when he should litigate the substantive issue with another taxpayer.

We think there are other considerations to be taken into account:

(a) We have already pointed out that the substantive foreign tax credit issue is a highly technical and complex issue. See p. 256 *supra*. We also think it highly likely that only a limited number of taxpayers will be affected, particularly since the Code section in dispute was repealed as of January 1, 1980, by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1052(c)(5), 90 Stat. 1520. Thus, there is not the potential for widespread discrimination such as existed in *United States v. Stone & Downer Co.*, 274 U.S. 225 (1927), involving the classification of wool for purposes of customs duties, a decision which, in any event, was later distinguished (see *Tait v. Western Md. Ry. Co.*, 289 U.S. at 625) on the basis of the special circumstances arising out of the creation of a new court.

(b) The Government chose not to file a petition for certiorari in *Union Carbide*. Cf. *United States v. Russell Manufacturing Co.*, 349 F.2d at 17, and particularly n. 4; Restatement, Judgments 2d, sec. 68.1 *supra*, comment to clause (a). We emphasize that we consider this aspect of the situation only an element to be taken into account and certainly not determinative.

(c) This is not a case where, if we were to deal with the substantive issue, we might give clarity and direction to earlier inconclusive and imprecise judicial forays. Such forays simply do not exist. *Union Carbide* stands alone and is certainly far from inconclusive or imprecise.

The long and the short of the matter is that we see no "injustice" in applying collateral estoppel herein. We do not take

lightly the need for respondent to be able to litigate the same issue in various circuits (see *Divine v. Commissioner,* 500 F. 2d at 1045–1050, where the issue was the same but the parties different), but we do not think that the balancing of the considerations involved herein justifies a departure from the usual principles, particularly in light of the recent decisions of the Supreme Court expanding the applicability of collateral estoppel.[43] *Montana v. United States, supra; Parklane Hosiery Co. v. Shore, supra; Blonder-Tongue Laboratories, Inc. v. University Foundation,* 402 U.S. 313 (1971).[44] In so concluding, we emphasize that, in another context, the balancing of considerations might cause us to conclude that the issue involved cried out for our consideration even though the same parties were involved.[45] That is simply not the case herein. Respondent will have to wait to get a further crack at the substantive issue when and if another taxpayer is involved.

*Decision will be entered under Rule 155.*

---

[43] We recognize that significant public policy considerations may be involved in the Federal tax arena, but such considerations, in and of themselves, are not sufficient to preclude the application of collateral estoppel. Cf. *Blonder-Tongue Laboratories, Inc. v. University Foundation,* 402 U.S. 313, 330–331 (1971).

[44] See also *Starker v. United States,* 602 F.2d 1341 (9th Cir. 1979). One can only speculate as to what the views of the Circuit Court of Appeals would have been in *Divine v. Commissioner,* 500 F.2d 1041 (2d Cir. 1974), if it had had the benefit of the Supreme Court's opinion in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979).

[45] Compare *McGowan v. Commissioner,* 67 T.C. 599 (1976), where we decided what appeared to us an important issue despite the respondent's desire to concede the case.